```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
```

UNITED STATES OF AMERICA,

       -against-                      **MEMORANDUM & ORDER**

                                           13-CR-660 (NGG)

ROY NAIM,
       also known as "Bill Howard,"

                     Defendant.
```
----------------------------------------------------------------------X
```
NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Roy Naim is charged in a superseding indictment with one count of conspiracy to sexually exploit a child, 18 U.S.C. § 2251(e); one count of sexual exploitation of a child, 18 U.S.C. § 2251(a); one count of attempted sexual exploitation of a child, 18 U.S.C. § 2251(e); four counts of receipt of child pornography, 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, 18 U.S.C. § 2252(a)(4)(B). (Superseding Indictment (S-1) (Dkt. 22).) All of the crimes charged arise from Defendant's use of his email accounts over an approximately fifteen-month period to pay for the production of, and otherwise request, sexually explicit images of young boys from a co-conspirator in Louisiana.

      Pending before the court is Defendant's pre-trial motion to suppress, which he filed on October 8, 2014. (See Def. Mot. (Dkt. 40).) Defendant principally seeks to suppress statements he made to government agents on September 18, 2013, the date on which the agents executed a search warrant of Defendant's apartment and computers and arrested him. (Id. at 1.) He also seeks to suppress any evidence obtained pursuant to his consent provided on September 18, 2013. (Id.) The Government filed a memorandum in opposition on October 24, 2014. (Gov't Opp'n (Dkt. 42).) Defendant filed a reply on October 29, 2014. (Def. Reply (Dkt. 46).)

1

On November 10 and 12, 2014, the court held an evidentiary hearing regarding Defendant's motion. (See Nov. 10, 2014, Hr'g Tr.; Nov. 12, 2014, Hr'g Tr.)[1] At the hearing the court received testimony of Department of Homeland Security ("DHS") Special Agent Christopher McClellan, Special Agent Chris Rommeney, and former Special Agent Jason Samuels, as well as Defendant Roy Naim and Defendant's parents, Ilana Naim and Rafael Naim. At the conclusion of the hearing, the court directed the parties to submit supplemental briefs, which were filed on November 18, 2014. (See Def. Supp. Mem. (Dkt. 58); Gov't Supp. Mem. (Dkt. 60).) The testimony and documentary evidence admitted at the suppression hearing established the following facts.

I.  FACTS

At approximately 6:00 A.M. on September 18, 2013, law enforcement agents from the Department of Homeland Security executed a search warrant on Defendant's residence in Mill Basin, Brooklyn. (Def. Mot., Ex. 1 (Affidavit of Roy Naim) ("Naim Aff.") (Dkt. 40) at 4; Tr. at 13, 73, 92.) Although estimates vary, approximately half a dozen agents entered the residence. (Tr. at 14, 92, 201, 231.) The agents were armed and wore vests and flak jackets that identified them as "Police" and "Homeland Security." (Id. at 47-48, 195, 231.) The agents did not have an arrest warrant. (Id. at 14, 180.)

Agents McClellan and Samuels testified that they knocked on the front door of the residence. (Id. at 15, 49-51, 180.) They were met at the door by Defendant's mother, Ilana Naim, who was wearing a bathrobe or sleepwear when she answered and opened the door. (Id. at 52, 80-81.) The agents testified that they identified themselves, stated that they had a search warrant, asked for Apartment 1, and asked Mrs. Naim to identify the occupants. (Id. at 15-16, 181.) According to the agents, Mrs. Naim identified the occupants and led the agents to the

---

[1] Citations to "Tr." refer to the transcript of the evidentiary hearing on November 10 and 12, 2014.

2

apartment. (Id. at 15-16, 181.) The agents testified that the conversation was polite and they did not shout. (Id. at 15-18, 181.) Mrs. Naim remembered the encounter as being more confrontational, with agents yelling and pushing past her when she opened the door. (Id. at 73, 74, 79.) Nonetheless, it is undisputed the agents identified themselves as police serving a search warrant and entered the building after Mrs. Naim opened the front door.[2] (Id. at 74, 80.)

After conducting an initial security sweep, the agents entered the bedroom on the right and encountered Defendant lying in bed. (Naim Aff. at 4; Tr. at 18, 181.) Agents McClellan and Samuels testified that they woke Defendant by tapping him on the shoulder, and Defendant sat up in bed. (Tr. at 18, 58, 182.) Defendant, however, testified that he was already awake, as a result of the commotion caused by the commencement of the execution of the search warrant, when the agents entered his bedroom. (Id. at 120, 143.) He testified that the agents shone a flashlight in his face in the darkened bedroom, and told him to put his hands up and stand up from the bed, and that he did stand up. (Id. at 123.)

Agents McClellan and Samuels identified themselves to Defendant and explained that they were executing a search warrant. (Naim Aff. at 4; Tr. at 18-20.) The agents explained that they worked in the computer crimes section of DHS on child exploitation cases. (Tr. at 19-20, 143, 181-82, 206.) The agents asked Defendant if he had any idea why they would be at his residence. (Id. at 20, 124-25, 143.) Although Defendant conceded that he was informed during the exchange that the agents were looking for child pornography (id. at 143), and that the agents never told him that he was under arrest or investigation for purposes of immigration (id. at 141-42), Defendant testified that, seeing DHS agents, he believed he was under arrest and was going

---

[2] Mrs. Naim testified that the agents told her nothing at the front door, but when she asked them to identify themselves, they yelled "search one." Defendant appears to concede in his post-hearing brief that given that Mrs. Naim's limited proficiency in English the agents likely responded "search warrant." (See Def. Supp. Mem. at 4 ("[T]hey yelled 'search one.' (sic.) (T.80) (Query, 'Search warrant"?)").)

3

to be deported "right then and there" based on his illegal status in the United States[3] (id. at 124, 127, 142-43).

The agents testified that after the initial exchange, Defendant asked the agents to close the door to his bedroom, at which time Agent McClellan explained to Defendant that he was not under arrest and that he was free to leave. (Id. at 20, 58, 182-83, 209-10.) Agent Samuels further testified that Defendant wanted the door closed because he did not want his mother to hear the conversation. (Id. at 182-83.) The agents testified that Defendant again asked them to close the door, that they again told Defendant that he was free to leave and that he was not under arrest, and that Defendant restated his desire to stay in the room and speak to the agents. (Id. at 20, 182-83.) Although Defendant concedes that he was told at least once that he was free to leave (id. at 131, 146, 175), Defendant denied telling the agents to close the door to his room (id. at 149).

After the agents closed the door, Defendant proceeded to make statements regarding his involvement with child pornography, which he now seeks to suppress. (Naim Aff. at 6; Tr. at 20.) Defendant testified that he spoke to the agents in an attempt to cooperate, based on their representation that his cooperation might ensure that he would not be arrested. (Tr. at 136, 146, 162-64, 171.) Defendant added that that the agents threatened to "rip the walls down" if he did not cooperate. (Id. at 146.)

---

[3] Defendant testified that during this exchange the agents made one reference to a newspaper article about him, indicating that they were aware of his immigration status (Tr. at 140-41), which the Agents McClellan and Samuels denied (id. at 31, 191). The agents conceded that they knew that Defendant was residing in the U.S. illegally (id. at 44-46), but testified that they expressly discussed at the pre-raid briefing "about how not to mention or really discuss immigration in this particular search warrant" (id. at 179; see also id. at 196). The court credits the testimony of the agents and does not credit Defendant's testimony as to this exchange. Not only was Defendant's testimony rebutted by the Government and uncorroborated by any other defense witness, but Defendant's demeanor and equivocal response are also inconsistent with credible testimony. His testimony is also in some conflict with his own concession that the agents never told him that he was under arrest or investigation for purposes of immigration. (Id. at 141-42.)

Agent McClellan initially began talking with Defendant in his bedroom, which, Defendant testified, was occupied by as few as two and as many as four armed agents. (Id. at 131-32, 155.) The testimony showed that the bedroom was rather small, containing a bed, a table, two bookshelves, and a closet. (Id. at 76, 97-98, 120, 143-45.) Because two of those agents came in to search Defendant's computer, Defendant and Agent McClellan eventually moved to another bedroom (the "back bedroom" or "spare bedroom") at the end of the hallway. (Id. at 21, 132-33, 155, 183.) Defendant led law enforcement agents to the spare bedroom, which was larger than Defendant's bedroom. (Id. at 21-22, 132-33, 156, 159, 184.) The agents testified that at the subsequent conversation in the spare bedroom, they again told Defendant that he was free to leave the room and that he was not under arrest, but that Defendant continued speaking with them. (Id. at 23, 184-85.) The agents testified the tone was calm and conversational. (Id. at 184-85.)

There was contradictory testimony about Defendant's freedom of movement. Defendant conceded that while he was talking with the law enforcement agents he was not handcuffed at any time, he was not told that he was under arrest, and that no agent drew a gun on him at any time. (Naim Aff. at 5; Tr. at 147, 156; see also id. at 21, 32, 184.) Defendant testified, however, that he was never left alone by the agents and was never advised that he was free to remain silent. (Tr. at 129, 135.) Defendant testified that he was denied permission to get water and put on sweatpants. (Id. at 125-26.) The agents conceded that Defendant was never left alone during the execution of the search warrant (id. at 64), but testified that they offered Defendant an opportunity to get dressed, to get water, and to go to the bathroom (id. at 18-19, 61-62, 191-92).

The conversation between the agents and Defendant prior to his arrest lasted approximately one and a half hours. (Id. at 32, 60, 76, 94, 97, 134.) By about 7:30 A.M.,

5

Defendant gave written consent for the law enforcement agents to log in and access his email accounts with his passwords. (Naim Aff. at 6; Gov't Ex. 20; Tr. at 24-26, 129, 185-86.) Shortly thereafter, after members of the DHS team completed a preliminary forensic preview of the laptop and iPhone in Defendant's bedroom and found evidence of child pornography, Agent McClellan left the spare bedroom and phoned a member of the U.S. Attorney's Office, who advised to place Defendant under arrest. (Tr. at 26-27.)

Defendant's parents testified that while their son was interviewed by the agents, they were not allowed to leave the living room at first and felt as though they had been imprisoned in their home. (Id. at 75, 81, 87, 91, 96.) Both parents testified that they were later allowed to move through the apartment—to go to the bathroom and get dressed—even though agents followed them and kept a close watch. (Id. at 81, 93, 96, 98.) They conceded that they were not handcuffed at any time and that the agents never drew their weapons. (Id. at 84, 100.)

At one point while Defendant was in the spare bedroom with the agents, Defendant's father began to speak loudly with law enforcement agents in the living room. (Id. at 23, 65-66, 75, 94, 104, 135.) Defendant's parents testified that when the father began to get agitated, one agent told him that "If you don't shut up I will arrest you as well." (Id. at 75, 93-94, 96.) The agents testified, by contrast, that, hearing commotion, they asked Defendant if he could go out and speak with his parents to let them know what is going on, but that Defendant declined. (Id. at 23-24; 187-89, 222-23.) Defendant conceded that a female agent informed him that his father was being loud, apparently inviting him to calm his father down, but the agent also informed Defendant that she would arrest his father if he did not stop yelling. (Naim Aff. at 3; Tr. 135, 156.) Agent Samuels testified that he went to speak to Defendant's parents to attempt to calm the situation and denied threatening to arrest the father if he didn't calm down. (Tr. at 187-88.)

Agent Samuels testified that at about the same time, Defendant's mother requested to see her son, and Agent Samuels told her that Defendant did not want to see her at that moment. (Id. at 190.) Defendant conceded that at some point Agent Samuels offered to bring his parents into the spare bedroom, but that he did not want to speak to them at that time because he wanted to speak to them "in a few minutes" after he collected his thoughts. (Id. at 160-61, 166.) Shortly before Defendant was arrested, Defendant's mother was permitted to go to the door of the spare bedroom to briefly converse with Defendant. (Id. at 76, 131, 159, 187.)

Soon thereafter, Agent McClellan returned to the spare bedroom and explained to Defendant that he would be placed under arrest on child pornography charges. (Id. at 27, 135-36, 170, 190.) Defendant was handcuffed, and Agent Samuels administered the Miranda warning, reading from a card. (Id. at 28-29, 136, 190-91.) Agent McClellan testified that Defendant reacted with visible shock to being placed under arrest. (Id. at 27-28.) Defendant asked law enforcement agents what he should tell his parents and explained that they did not know that he was bisexual. (Id. at 28, 191).[4] The agents responded that that was up to Defendant. (Id.)

Defendant was then transported to the DHS office for processing. (Id. at 29.) Shortly after 10:00 A.M., Defendant signed another consent form which allowed the law enforcement agents to assume the online presence of Defendant's email accounts. (Naim Aff. at 6; Gov't Ex. 21; Tr. at 30-31.) Afterwards, Defendant was transported to the U.S. District Court for the Eastern District of New York for his initial appearance.

---

[4] Defendant also testified that his parents had no knowledge of his sexual orientation or his alleged interest in child pornography. (Tr. at 149-53, 183.) Defendant's father testified that he did not know of his son's alleged sexual interest in children. (Id. at 105-06.)

7

## II.   THE PARTIES' CONTENTIONS

### A.   Defendant's Arguments

Defendant argues that statements that he made during his initial conversation with the agents on September 18, 2013, in the course of the agents' execution of the search warrant but prior to his formal arrest, should be suppressed because he was in "custody" and the agents failed to provide Miranda warnings. (Def. Mem. (Dkt. 40-4).) Defendant notes that he was brought to the United States from Israel when he was three years old on a short-term visa that had expired almost twenty-four years before the date of the arrest. (Naim Aff. at 5.) He notes that he had never established any other legal basis for remaining in the U.S. and that he had become politically active and visible in the immigrant rights movement. (Id.) As a result, during the course of the search of his bedroom by agents of the DHS, he "firmly believed that these government agents . . . were at [his] house for the specific purpose of arresting me to begin the legal process of deportation." (Id.)

In support of his argument that he was in custody, Defendant also emphasizes what he believes to be "several coercive aspects of the interrogation." (Def. Mem. at 2.) Defendant underscores: (1) the agents' non-consensual entry into his residence; (2) that the occupants had been asleep when agents arrived; (3) the agents' verbal orders to the occupants not to move; (4) the agents' "insistent and rapid dispersal" throughout the residence, (5) the agents' alleged threat to arrest Defendant's father; (6) the large number of agents involved; (7) the fact that agents were armed; (8) the agents' failure to affirmatively tell Defendant that they were not arresting him for immigration violations; and (9) the agents' failure to warn Defendant of his rights. (Id.)

In light of the foregoing circumstances, Defendant posits that a reasonable person would understand himself to be in "custody" within the meaning of Miranda, requiring law enforcement

agents to warn him of his constitutional rights and obtain a waiver before he could be questioned. (Naim Aff. at 12.) Because the agents failed to provide him with Miranda warnings until after they placed him under arrest, Defendant argues his statements should be suppressed based on a violation of the Miranda doctrine. (Id. at 12-13.) Additionally, Defendant moves to suppress any emails and other tangible evidence obtained pursuant to the consent forms that he signed on the basis that such evidence is the impermissible fruit of the above-mentioned initial violation of the Miranda doctrine. (Def. Mem. at 3-5.)[5]

### B.   Government's Arguments

In response, the Government argues that the totality of circumstances demonstrates that Defendant was not in custody when he made the incriminating statements at issue. (Gov't Opp'n at 5.) The Government emphasizes that (1) the interview occurred "in the familiar circumstances of the defendant's own home"; (2) Defendant was not handcuffed or restrained; (3) law enforcement agents affirmatively informed Defendant on several occasions that he was not under arrest and was free to leave; (4) Defendant elected to stay in his room with the agents of his free will; (5) Defendant was free to move around the home and led agents to another room; (6) Defendant's immigration status and subjective consciousness of guilt is irrelevant; and (7) the agents' interaction with Defendant's parents is likewise irrelevant. (Id. at 5-6; Gov't Supp. Mem. at 8-10.) As a result, the Government argues that the agents were under no legal obligation to provide Miranda warnings during the course of the search of Defendant's apartment, and the statements made by Defendant were voluntary and admissible. The Government adds that because it is not seeking to introduce any emails and other tangible

---

[5] Defendant argues because he was in custody when he signed first consent form, the second consent form, obtained after he received the Miranda warnings, was "nonetheless tainted by the unconstitutional taking of the earlier statements and the unconstitutional obtaining of the earlier consent." (Naim Aff. at 14.) Therefore, Defendant seeks to suppress any physical evidence seized pursuant to both consent forms under the "fruit of the poisonous tree" doctrine. (Def. Mem. at 3.)

9

evidence obtained pursuant to Defendant's consents provided on September 18, 2013, but rather relying on evidence obtained from an independent source, there is no basis to suppress that evidence.[6] (Gov't Opp'n at 11; see also Gov't Nov. 11, 2014, Ltr. (Dkt. 48).)

### III.    SUPPRESSION OF ORAL STATEMENTS

####    A.    Legal Standard

A person in custody is entitled to Miranda warnings prior to official interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). It is well-settled that the Miranda warnings are triggered only if a criminal defendant is subject to "custodial interrogation." Illinois v. Perkins, 496 U.S. 292, 296 (1990). In determining whether a defendant is in custody for Miranda purposes, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citations omitted); see also Howes v. Fields, 132 S. Ct. 1181, 1189-90 (2012) (issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda"). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. Howes, 132 S. Ct. at 1189. The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. See Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam) (whether a suspect is in custody depends on the objective circumstances and

---

[6] Defendant has not responded to the Government's representations concerning emails and other tangible evidence in any way—neither in his reply memorandum, nor his post-hearing brief.

10

not on "the subjective views harbored by either the interrogating officers or the person being questioned"); United States v. Kirsteins, 906 F.2d 919, 923 (2d Cir. 1990) (suspect's subjective belief that he was not free to leave was irrelevant; the question was what a reasonable person would have believed).

**B.     Discussion**

The totality of the circumstances, viewed objectively, compel the conclusion that Defendant was not in custody during the execution of the search warrant on September 18, 2013, until his official arrest later that morning. At first, evidence tends to support Defendant's version of the "several coercive aspects of the interrogation." For example, the search of Defendant's apartment occurred at 6:00 A.M. in the morning, approximately half a dozen armed DHS agents entered the residence, and the Naim family was awakened and startled. (Naim Aff. at 4; Tr. at 13, 73, 92) Defendant and the Government appear to agree, however, that the manner of the execution of the search was not atypical. (Def. Supp. Mem. at 8-10; Gov't Mem. at 6-7.) Consistent with the testimony, Defendant conceded that "all of the elements to which defendant's witnesses have testified . . . are present in every other case in which a search warrant is executed." (Def. Supp. Mem. at 8-10.) Cf. Orozco v. Texas, 394 U.S. 324, 327 (1969) (interrogation deemed custodial when suspect was questioned in his bedroom in the early hours of the morning and told that he was under arrest and not free to leave). Still, Defendant argues that such a search reasonably constitutes custody (Def. Supp. Mem. at 8-10), implicitly inviting the court to transform every routine execution of a search warrant into a custodial interrogation. The court declines Defendant's broad invitation and goes on to address other distinguishing facts in this case.

One distinguishing characteristic of this case is Defendant's undocumented status in the United States. (Naim Aff. at 5.) Defendant argues that faced with agents of the DHS, an agency he associates with enforcement of the nation's immigration laws, he reasonably concluded that he was immediately under arrest due to his immigration status. (Id. at 5; Tr. at 124, 142-43.) However, Defendant's theory is overbroad because it invites his subjective consciousness of guilt to transform the agents' search of his apartment pursuant to a search warrant into "custody" based principally on his state of mind. That is, however, in direct conflict with the law, which directs the courts to apply an objective standard. Stansbury, 511 U.S. at 323 (whether a suspect is in custody depends on the objective circumstances and not on "the subjective views harbored by either the interrogating officers or the person being questioned"). Although the DHS agents conceded that they knew that Defendant was residing in the United States illegally (Tr. at 44-46), their subjective knowledge of Defendant's immigration status is similarly irrelevant. Rather, the only relevant facts concern what occurred and what was said during the execution of the search warrant.

In contrast to Defendant's subjective consciousness of guilt, his immigration status does not appear to have been mentioned at all on September 18, 2014. Defendant conceded that the agents never told him that he was under arrest or investigation for purposes of immigration. (Id. at 141-42.) Rather, the agents clearly identified themselves as DHS agents who worked on child exploitation cases and that they were looking for child pornography. (Id. at 19-20, 143, 181-82, 206.) Under an objective standard, therefore, Defendant's immigration status was not at issue during the encounter and therefore irrelevant to the court's analysis of custody.

Furthermore, the initially startling atmosphere of the search was subsequently dispelled by affirmative statements that the agents made to Defendant. Although there is disagreement

12

about the number of times that agents advised Defendant that he was not under arrest and free to leave—with agents placing the number as high as five (id. at 184)—Defendant concedes that he was told at least once that he was free to leave (id. at 131, 146, 175). Such affirmative statements would place a reasonable person in the suspect's position on notice that he was not in custody. See United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (defendant not in custody in particular because agents informed defendant and wife that they were not under arrest and could ask the agents to leave); Mitchell, 966 F.2d at 98 (custody inquiry "focuses upon the presence or absence of affirmative indications that the defendant was not free to leave").

Importantly, Defendant conceded that he was not handcuffed at any time while he was talking with the law enforcement agents or told that he was under arrest during the conversation with the agents, until his formal arrest later in the morning. (Naim Aff. at 5; Tr. at 147, 156.) See United States v. Akapo, 420 F. App'x 42, 44 (2d Cir. 2011) (defendant not in custody in part because not handcuffed); United States v. Titemore, 437 F.3d 251, 260 (2d Cir. 2006) (defendant not in custody because not arrested or restrained).[7] At no time did any agent draw a gun at Defendant. (Tr. at 147.) Although the agents accompanied Defendant between his bedroom and the spare bedroom, they never touched him or physically impeded his movements in any way.

In light of such a lack of restraints, the court concludes that Defendant's confinement in his bedroom took place as a result of his own volition. In fact, Defendant testified that he spoke to the agents in an attempt to cooperate, based on their representation that his cooperation might ensure that he is not arrested. (Id. at 136, 146, 162-64, 171.) By contrast, Defendant's testimony that the agents threatened to "rip the walls down" if he did not cooperate was neither

---

[7] Defendant argues that his belief that he was under arrest for an immigration violation was reasonable in light of the agents' failure to affirmatively tell Defendant that they were not arresting him for immigration violations. (Def. Mem. at 2; Naim Aff. at 12.) However, Defendants cites no authority for the proposition that the DHS agents were under an affirmative duty to advise him specifically as to his immigration violations.

13

corroborated nor convincing. (Id. at 146.) Defendant further contradicted himself when he posited that he was already (subjectively) under arrest when the agents interviewed him, and he cooperated in an attempt to not be arrested. (Id. at 171.) While Defendant was surely laboring under the pressures of a stressful situation, his cooperation does not stem from impermissible coercion on the part of government agents.

Furthermore, although there is conflicting testimony as to whether Defendant asked the agents to close the door, Defendant conceded that on at least one occasion he chose not to leave the room or speak with his parents when offered the opportunity to do so because he wanted to wait to collect his thoughts. (Id. at 160-61, 166.) Defendant also testified that his parents had no knowledge of his alleged sexual orientation or his alleged interest in child pornography. (Id. at 149-53, 183.) The execution of a search warrant for evidence of child pornography would have been alarming, which tends to explain why Defendant may not have wanted to leave the room to confront his parents about the subject matter of the search. Collectively, this demonstrates an element of choice by Defendant, in the context of his concession that he was offered an opportunity to leave. Akapo, 420 F. App'x at 44 (2d Cir. 2011) (defendant not in custody in part because he never indicated he wanted to leave).

Finally, the agents' search of the apartment and conversation with Defendant prior to his formal arrest lasted approximately one and a half hours. (Tr. at 32, 60, 76, 94, 97, 134.) Under prevailing case law, this relatively short duration is consistent with a finding that Defendant was not in custody. See Badmus, 325 F.3d at 139 (defendant not in custody where agents searched his apartment for nearly three hours); Kirsteins, 906 F.2d at 922 (defendant not in custody when interviewed by federal agents for approximately three hours).

14

In light of the foregoing, the court agrees with the Government that the agents' interactions with Defendant's parents were largely irrelevant. It is undisputed that the initial interaction between the agents occurred with Defendant's mother when she answered the door (Tr. at 15-18, 52, 81), and that Defendant was not present. Similarly, Defendant's parents were not present for the conversation between the agents and Defendant and he was not present for the interaction in the living room between his parents and the agents. (Id. at 75, 84, 104-05.) In light of Defendant's apparent voluntary choice to stay in the bedrooms with the DHS agents and postpone his conversation with his parents, any tensions between the agents and Defendant's parents do not persuade the court that the atmosphere presented inherently coercive pressures similar to a stationhouse interrogation.

Accordingly, the totality of circumstances demonstrates that Defendant was not in custody when he made the incriminating statements at issue. As a result, no Miranda warnings would have been required up until that moment, and Defendant's inculpatory statements to the agents do not need to be suppressed. Accordingly Defendant's Motion to Suppress his oral statements is DENIED. Because the court finds that there has not been a violation of the Miranda doctrine, Defendant's Motion to Suppress the physical evidence obtained as a result of his consent is DENIED as well.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
       November 24, 2014

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

15