UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

-against-

**13-CR-660 (NGG)**

ROY NAIM,
          also known as "Bill Howard,"

          Defendant.

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Following a four-day trial, on December 10, 2014, Defendant Roy Naim ("Defendant"
or "Naim") was convicted by a jury of one count of attempted sexual exploitation of a child, in
violation of 18 U.S.C. § 2251(e); four counts of receipt of child pornography, in violation of 18
U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C.
§ 2252(a)(4)(B). The jury acquitted Naim of conspiracy to sexually exploit a child, in violation
of 18 U.S.C. § 2251(e); and sexual exploitation of a child by aiding and abetting, in violation of
18 U.S.C. §§ 2251(a) and 2. Naim now moves pursuant to Federal Rules of Criminal
Procedure 29(c) and 33 for a judgment of acquittal or for a new trial, solely with respect to his
conviction for the attempted sexual exploitation of a child. (Mot. to Set Aside Verdict ("Def.
Mot.") (Dkt. 110).) The Government opposes the motion. (Resp. in Opp'n to Def.'s Post-Trial
Mot. ("Gov't Opp'n") (Dkt. 113).) For the reasons set forth below, Naim's motion is DENIED.

## I.     BACKGROUND

### A.     The Charges

      As noted above, Naim's post-trial motion challenges a single count of conviction—

attempted sexual exploitation of a child, in violation of 18 U.S.C. § 2251(e)[1]—which was

charged as Count Three of the Superseding Indictment. Specifically, Count Three alleged that:

> In or about and between January 2013 and May 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ROY NAIM, also known as "Bill Howard," together with others, did knowingly and intentionally attempt to employ, use, persuade, induce, entice and coerce a minor, to wit: John Doe,[2] an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct, to wit: images, knowing and having reason to know that such visual depictions were produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce, by any means, including by computer, and such visual depictions were transported using any means and facility of interstate and foreign commerce.

(Superseding Indictment (S-1) at 2-3 (Dkt. 22) (citing 18 U.S.C. §§ 2251(a), 2251(e), 2,

and 3351 et seq.).) Counts Four through Seven charged Naim with receipt of child pornography,

on or about and between January 2, 2013, and January 7, 2013 (Count Four); February 10, 2013

(Count Five); February 10, 2013 (Count Six); and April 21, 2013 (Count Seven). (Id. at 3-5.)

Count Eight charged Naim with possession of child pornography on or about September 18,

2013. (Id. at 5-6.) The jury convicted Naim on each of these counts.

Naim was acquitted on Counts One and Two of the Superseding Indictment. Count One

charged Naim with conspiracy to sexually exploit John Doe in or about and between May 2012

and May 2013; Count Two charged Naim with sexual exploitation of John Doe by aiding and

abetting in or about and between January 2013 and February 2013. (See id. at 1-2; Final Jury

Charge (Dkt. 97) at 19-29.)

---

[1] This offense is often referred to as the attempted production of child pornography; the court uses "production of child pornography" and "sexual exploitation of a child" interchangeably in this Memorandum and Order.

[2] The court refers to the minor victim as "John Doe," as does the Government, in order to protect his privacy.

### B.    Procedural History

Naim was arraigned on the Superseding Indictment on February 27, 2014.  (Feb. 27,

2014, Min. Entry (Dkt. 26).)  Prior to trial, the court ruled on various motions in limine; none of

those decisions are challenged in the instant motion.  (See, e.g., Nov. 24, 2014, Mem. & Order

(Dkt. 71) (denying Naim's motion to suppress); Nov. 24, 2014, Order (granting Government's

unopposed first and second motions in limine); Nov. 24, 2014, Order (denying non-party Google

Inc.'s motion to quash subpoena); Dec. 1, 2014, Mem. & Order (Dkt. 85) (denying

Government's motion to admit evidence of other acts).)

Magistrate Judge Viktor V. Pohorelsky selected a jury on December 2, 2014.

(Dec. 2, 2014, Min. Entry (Dkt. 99).)  The jury was sworn, and trial began, on December

3, 2014.  (Dec. 3, 2014, Min. Entry (Dkt. 101).)  On December 8, 2014, upon the close of the

Government's case, Naim moved pursuant to Federal Rule of Criminal Procedure 29(a) for a

judgment of acquittal on all counts; the court denied the motion.  (Dec. 8, 2014, Min. Entry

(Dkt. 102); see also Trial Transcript ("Tr.") at 632-41.)  Naim chose not to call any witnesses or

enter into evidence any exhibits, and renewed his Rule 29(a) motion upon resting; the court again

denied Naim's motion.  (Tr. at 644-47.)  The jury began its deliberations on the afternoon of

December 9, 2014 (Tr. at 819), and rendered its verdict the following day (Tr. at 840-44).  In

accordance with the schedule set by the court for post-trial motions, Naim filed the instant

motion on January 30, 2015, and the Government filed its opposition on February 20, 2015.  (See

Dec. 10, 2014, Min. Entry (Dkt. 105); Def. Mot.; Feb. 19, 2015, Order (Dkt. 112); Gov't Opp'n.)

### C.    Evidence Presented at Trial

The evidence at trial supporting Naim's conviction on Count Three consisted principally

of email and other electronic communications between Naim and Jonathan Johnson ("Johnson"),

the creator/administrator of the child pornography website "BoysOnWebcam"; images and video files exchanged during those communications; an iMessage chat between Naim and Jerry Biegeleisen[3] ("Biegeleisen"), an acquaintance of Naim; business records; the testimony of experts in the forensic analysis of computers and mobile devices, and those experts' forensic analyses of Naim's and Johnson's computers and of Naim's iPhone (including image and video files contained thereon); and the testimony of several fact witnesses, including John Doe's mother, Naim's father, and the director of the camp at which Naim first met John Doe. The email and other electronic communications between Naim and Johnson are of primary relevance to the instant motion; accordingly, many of those communications are quoted in full below.

The Government proved beyond a reasonable doubt that Naim sent and received the communications at issue: The evidence presented at trial overwhelmingly identified Naim as the user of the two email addresses and iPhone that engaged in the communications with Johnson. The iPhone was retrieved upon execution of a search warrant at Naim's residence (Tr. at 328), and business records and the testimony of Naim's father clearly identified Naim as the user of the iPhone. (See Tr. at 246-47, 303-13, 317-19; GX 301; GX 709; GX 710; GX 711; GX 712; see also, e.g., Tr. at 175-76 (phone number was associated with Facebook account user "roy.naim33").) Business records tied Naim to the two email addresses utilized in connection with these communications: naimroy@gmail.com and brooklynfun123@gmail.com. (See, e.g., Tr. at 246-50, 274-86, 288-98; GX 301; GX 302; GX 351; GX 352; GX 706; GX 707; GX 708; GX 805; GX 806; GX 807; GX 808.) Substantial additional evidence also established that Naim was the sole user of the email address brooklynfun123@gmail.com, despite its being nominally attributed to "Bill Howard." First, Naim admitted that he used both email accounts, and that he

---

[3] This is the spelling of Jerry's surname as indicated in the contact list of Naim's iPhone, although it is unclear whether this spelling is accurate. (Compare Tr. at 336, and GX 402-A, with Tr. at 598.)

was the only person with access to the accounts; additionally, he provided the correct passwords for both accounts to law enforcement agents. (Tr. at 596-97.) Second, in various emails nominally sent by "Bill Howard" from brooklynfun123@gmail.com, the user of that email address identified himself as "Roy" or "Roy Naim," described himself consistent with Naim's appearance, and attached photographs that appeared to depict Naim. (Tr. at 553-57; GX 300-C; GX 300-D; GX 300-E.) Third, in an email nominally sent by "Bill Howard" from brooklynfun123@gmail.com, the user of that email address provided Naim's iPhone telephone number for follow-up communication. (Tr. at 556-57; GX 300-C.) Finally, in an email sent to Johnson by "Bill Howard" from brooklynfun123@gmail.com, the user of that email address asked Johnson to send videos to Naim's iPhone telephone number. (See Tr. at 170.)

Moreover, Naim did not dispute his use and control of these email addresses, or that he had in fact sent the communications attributed to him at trial and recounted by the court below. Indeed, he did not dispute much of the case against him at all. Instead, Naim disputed only—as he does now—the proper inferences and conclusions to be drawn from those communications. (See, e.g., Tr. at 736-54 (Defendant's closing argument).)

### 1. Jonathan Johnson

Johnson was the creator and administrator of the "BoysOnWebcam" website, through which he produced and distributed child pornography. (Tr. at 58, 182-83, 523-26.) Johnson controlled and utilized the email address boysonwebcam@gmail.com in order to administer this website. Using boysonwebcam@gmail.com, Johnson sent previews for content accessible through the website or by subscription, moderated comments on posted material, and received special requests for videos of child pornography. (Tr. at 58, 60, 522, 524.)

The evidence at trial established how Johnson obtained the videos of child pornography

that he distributed through BoysOnWebcam: He recorded them himself, over the Internet, through deception. Using a female Skype[4] profile/persona and videos of a female[5] (Tr. at 187, 451, 523), Johnson pretended to be a teenage girl, convinced underage boys to perform sexual activities in front of a webcam, and recorded them. (See, e.g., Tr. at 183-84, 187, 451, 523.) Johnson tricked his victims into believing that they were actually communicating with this female (see Tr. at 449-51 (Skype does not permit a user to project a video other than the one captured by the user's own webcam; Johnson used a different program called ManyCam, which allowed him to select a video file and make it appear that the video file was actually a video streaming from a webcam); see also Tr. at 565-66; GX 523-B), and his victims did not know they were being filmed (see Tr. at 453-56 (Skype does not permit a user to record video calls; Johnson's computer contained two discrete programs, Camtasia Studio and 1st Screen Recorder, which allowed him to capture the content of his Skype sessions and export that content into a video file or files)).

Johnson created three pornographic videos of the underage victim in this case, John Doe, all of which Naim accessed, downloaded, and viewed. (Tr. at 528.) See also infra Part I.C.5-6.

### 2. Initial Communication with Johnson

The first communication between Naim and Johnson that was introduced at trial occurred on May 28, 2012. In an email sent by naimroy@gmail.com to boysonwebcam@gmail.com, Naim reached out Johnson. In that first communication, Naim told Johnson that he approved of or appreciated Johnson's website (Tr. at 72; GX 202 ("Hey bro. First off, I think it real cool

---

[4] Skype is a voiceover Internet protocol program through which individuals can communicate with each other via webcam (video), microphone (audio), and/or instant messaging, by way of the Internet. (Tr. at 73, 448-49.)

[5] Johnson had obtained videos of a female. In some of these videos, the female was engaged in computer-type activities, in which it appeared that the female was typing or chatting on a computer via webcam. Other videos were sexually explicit; the female was engaged in sexual activity in front of the webcam. (Tr. at 183-84.) Johnson created various loops of this video content, which he would play at appropriate times during his communications with his underage victims. (Tr. at 184.)

what you are doing in general... And for free (except for the few secs[6] ads that pop up which I hope you make lots of money)."), and asked Johnson if it was possible to view the videos without downloading them (Tr. at 72-73; GX 202). Naim also asked Johnson about the origin of the videos. (Tr. at 72-73; GX 202 ("I am curious though, where you getting these videos from?").)

Johnson explained to Naim that he created the videos posted on BoysOnWebcam. Johnson stated: "I don't 'get' them from anywhere. I record them myself on chatroulette,[7] skype, omegle, etc." (Tr. at 73; GX 202.) Naim responded positively: "That's real cool you find them. It takes lots of time I am sure. Really awesome of you! . . . And again, you rock for this." (Tr. at 74; GX 202.) After some additional back-and-forth, regarding technical issues with video playback (Tr. at 74-76), Naim inquired further as to the origin of the videos. Naim wrote: "Curious, so these boys, are you baiting them with a girl? Or they know they jacking off with you? Cuz I was always fascinated how you get them." (Tr. at 76; GX 202.) Johnson replied: "I use a video of a fake girl and just pretend like I'm her. I took the video (originally only like 7 minutes long) and chopped it up into various loops and transitions, so I can sit and record, go back and forth between her playing/typing/etc for like 2-3 hours without them even realizing it's not really her, lol." (Tr. at 76; GX 202.) Naim wrote back: "That is really amazing! Ha. Man, and these teens just go for it not realizing she is doing the same thing over and over. LOL." (Tr. at 76; GX 202.) Accordingly, by the end of May 2012, Naim knew and understood how the BoysOnWebcam child pornography videos distributed by Johnson came into existence.

---

[6] Spelling and grammatical errors in the communications quoted in this Memorandum and Order appear in the original communications.

[7] Chatroulette is a messaging website that allows an individual to create a profile and chat with another individual he or she does not know, who could be located anywhere in the world; Omegle is a chat website through which two individuals can chat with each other without knowing each other. (Tr. at 73, 186-187.)

3.    Communications with Johnson: May 2012 through January 2013

Between May 2012 and January 2013, Naim and Johnson exchanged numerous additional communications. Through these communications, Naim learned that Johnson resided in Louisiana, where he worked at a carwash, and that Johnson had been creating similar videos for approximately five years; Naim also shared information about himself. (See Tr. at 77-79, 82-86; GX 202; GX 204-R.) For example, Naim noted that he was "a marketer but I outsource anything that will bring me a headache aka coding and site design or such. Just leave me to the marketing." (Tr. at 77-78; GX 202.) Naim acknowledged that he understood Johnson's pornographic videos included underage subjects. (Tr. at 79; GX 202 (Naim: "How old are many of those teens? They hardest to tell."; Johnson: "[L]ike I said on the site, they're all 18+ :D"; Naim: "And ha. But come on. Some have to be 16. :)").) At the end of May 2012, Johnson failed to respond to Naim's emails several times, and Naim repeatedly re-initiated their conversation. (E.g., Tr. at 79-82; GX 202; GX 203; GX 204-R.)

In subsequent email and chat communications, Naim learned that Johnson was continuing to record videos for BoysOnWebcam, and Naim expressed appreciation and arousal. (See Tr. at 86-88; GX 205-1; GX 207.) Naim continued to download and view Johnson's videos, and he continued to communicate with Johnson regarding the content of those videos and technical issues with respect to viewing them. (Tr. at 89-94; GX 209.) Emails sent from Johnson to an email distribution list (including Naim) in July 2012, and subsequently in November 2012, indicated that after encountering hosting problems, BoysOnWebcam was back online. (See Tr. at 88; GX 207 ("Letting everyone know that the new URL to the new site is http://boysonwebcam.net now, and while all the posts are gone, I will be slowly re-adding a lot of them, as well as uploading a lot of new content too. :)") (July 16, 2012); Tr. at 89; GX 208

8

("http://boysonwebcam.net is back up and running, and i'm not gonna just let it die this time :)")
(Nov. 27, 2012).) Naim welcomed Johnson back and noted that Naim was "playing around to
see what you got." (Tr. at 90; GX 209.)

On January 3, 2013, Naim posted a comment to Johnson's website, which read: "Hey.
I say instead of uploading the past which will take a lot of time, just keep posting as normal with
new stuff. I am sorry some people have too much time and like to cause pain to others... that
does suck. We are appreciative of what you do though." (Tr. at 97; GX 232; see also Tr. at 94-
96.) Later that day, Naim emailed Johnson, asking Johnson to delete Naim's comment to the
website because it "has my name and picture. Big mistake. Thank you." (Tr. at 94; GX 211.)
The following day, Johnson responded: "Took care of it for you. Sorry it took a bit, kinda busy
as you can imagine now, lol." (Tr. at 95; GX 211.) Naim replied: "for sure and thank you so
much. keep rocking bro." (Tr. at 95; GX 211.)

On January 8, 2013, Naim initiated another email conversation with Johnson regarding
several videos. Naim wrote: "jonathan... boys will be boys – Crazy. the last video with them
giving head – wow. . . . when was these taken? doing more with them? . . . sorry for the hell u r
going thru – anything I can do to help?" (Tr. at 97-98; GX 212.) Johnson responded: "That's all
I have and probably all I will have of them sadly, haven't talked to any of them in a long while."
(Tr. at 98; GX 212.) Naim asked: "how long ago?" (Tr. at 98; GX 212.) Johnson stated: "#75
was on October 28 / #76 was on November 10 / #77 was on October 29."[8] (Tr. at 98; GX 212.)
Naim noted: "not that lo[n]g ago... why not contact them? i can watch them all day." (Tr.
at 98; GX 212.)

---

[8] These numerals referred to the file names given to the BoysOnWebcam videos Naim had downloaded
(bow0075.avi, bow0076.avi, and bow0077.avi). A forensic analysis of Johnson's computer confirmed that Johnson
told Naim the correct dates of production. (See Tr. at 456-61; GX 504; GX 505; GX 506; GX 658-A; GX 658-B;
GX 658-C.)

4.     Naim's Connection to John Doe

In 2008, Naim had volunteered as a counselor at a sleep-away camp named Camp Simcha, which was attended by children afflicted with cancer. (Tr. at 204, 209, 216, 219-23; GX 713; GX 714.) There, Naim met John Doe, who was a camper that same year. (See Tr. at 204, 212, 217-19; GX 715; GX 716.) John Doe has a scar to the left of his belly button, where he once had a feeding tube. (Tr. at 207.)

Naim remained in touch with John Doe's family, and from at least late 2011 through July 2012, Naim communicated with John Doe's mother through Facebook's messaging application. (Tr. at 209-13; see also Tr. at 176-77 (Facebook profile "The Roy Naim" had as "friends" both John Doe and John Doe's mother).) In late 2011, Naim asked John Doe's mother if she possessed a DVD of a production of The Lion King that had been performed at Camp Simcha; Naim stated that he had lost his copy and was hoping to obtain another copy. (Tr. at 210-13.) In July 2012, Naim again asked John Doe's mother if she had located a copy of that DVD. (Tr. at 212; GX 1003.)

5.     Exploitative Videos of John Doe

In January 2013, Naim came across two child pornography videos on BoysOnWebcam featuring John Doe. Johnson had created these two videos around mid-January 2013. (See Tr. at 507-11, 567-70; GX 516-D; GX 516-DX; GX 516-E; GX 516-EX; GX 523-A; GX 658-P; GX 658-Q.) Naim downloaded these two videos, identified by the file names "bow0090.avi" and "bow0091.avi," to his computer.[9] (See Tr. at 507-09, 567-70; GX 516-D;

---

[9] The file names of the same videos as saved to Johnson's computer were "vcam_skype - 15 yo [john] tries to jerk again, almost gets caught (no cum).avi" (bow0090.avi), and "vcam_skype - 15 yo [john].avi" (bow0091.avi). (See Tr. at 508-10; GX 658-P; GX 658-Q.) The file corresponding to bow0090.avi was created on Johnson's computer on January 17, 2013; the file corresponding to bow0091.avi was created on Johnson's computer on January 15, 2013. (Tr. at 508, 510.) The videos were each approximately 17 to 18 minutes long, and both portrayed John Doe masturbating. (See, e.g., Tr. at 568-69; GX 402-A.)

GX 516-DX; GX 516-E; GX 516-EX; GX 523-A.) Naim recognized John Doe not only because of his general appearance but also because of the scar near John Doe's belly button. (See Tr. at 336, 570; GX 402-A; GX 523-A.)

On January 19, 2013, Naim emailed Johnson regarding one of these videos. (See Tr. at 101; GX 213.) Naim asked Johnson: "What's the details on 90? Did you do more video with him? Omegle? Skype?" (Tr. at 101; GX 213.) Johnson responded: "Skype – more to come hopefully :P." (Tr. at 101; GX 213.) In two consecutive emails, Naim inquired further, asking, "when did this happen?" (8:46 p.m.), and "recent or while ago?" (8:55 p.m.), and Johnson responded, "Like 3 days ago lol." (Tr. at 102; GX 213.) Naim continued to seek additional details: "wow – but where did you find him? on omegle and then told him to get on skype?" (Tr. at 102; GX 213.) Johnson replied: "I think I found him on meetme.com originally." (Tr. at 102; GX 213.)

On January 20, 2013, using the iPhone application iMessage, Naim contacted an acquaintance, Jerry Biegeleisen, who had also worked at Camp Simcha and thus knew John Doe. (See Tr. at 598; GX 402-A; see also Tr. at 742 (Defendant's closing argument).) Naim and Biegeleisen had the following conversation:

| | |
|---|---|
| Naim: | Problem.  Remember [john Doe]? |
| Naim: | Ok.  Don't ask how this was found but um there's a video of him jacking off online.  Not sure what to do |
| Biegeleisen: | How do u know it him |
| Biegeleisen: | Where the video? |
| Naim: | On a video site. |
| Naim: | One of these sites that host all these things. |

Naim:            Um. It's [john]. Trust me. Plus he is the only guy
                 who has a mark near belly button from feeding tube.

Biegeleisen:     Will ttyl about

Naim:            I emailed the owner maybe. How I found it – well,
                 a friend was stupid and jacked off webcam with
                 someone he thought was a lady. It wasn't. He
                 didn't even make sure. This guy recorded him.
                 Now we are both looking for it. Guy also trying to
                 bribe him.

Biegeleisen:     K ttyl as kid taking my phone

Naim:            In process, I'm like OMG – that's [john]. Or one,
                 it's child pornography. For another, I don't think
                 [john] knows it was a dude (though he may be bi.)

                              *       *       *

Biegeleisen:     How old is [john]

Naim:            16 I think

Naim:            Seems like that's the age of consent there. In NY
                 it's 17. But he may be 15. Either way

Naim:            Think gonna tell his older brother.

Biegeleisen:     I don't think u should will talk to u latter about u
                 have video

Naim:            I already did. Brother and I are close. He is gonna
                 take care of it. Won't tell [john] though.

Biegeleisen:     How he taking care off

Naim:            We getting video down for now. But that's all we
                 can do

Biegeleisen:     You should save link and report site.

(Tr. at 335-38; GX 402-A.) The following day (January 21, 2013), Naim and Biegeleisen

continued to discuss the video of John Doe:

Biegeleisen:   Send link to [email address]

Biegeleisen:   Nobody know it...............      .

Naim:          You won't be able to see online.  I'm gonna have to
               drop box it.

Naim:          See on phone I mean

Biegeleisen:   K that email don't go to my phone

Naim:          Ok.  Ill send it when you can get online.  I wanna be
               there when you watch.  And got to setup drop box

Biegeleisen:   I have drop box with that email.  I need to get out of
               my house need my freedom

                              *      *      *

Naim:          OMG.  He posted again of [john].   Think [john]
               went back to this person

Biegeleisen:   Is it same video

Naim:          Nope.  A new one.  I'm getting it down.

Naim:          [John]!  Someone needs to tell him to be smart.

Biegeleisen:   Send me link I wanna see em and I have an idea to
               tell him without getting his brother involved and
               him knowing we saw

Naim:          I emailed the site directly.  His brother forgot prob.
               He is like that.  If by tonight it's not gone.  New
               plan.

Biegeleisen:   My laptop works

Naim:          Oh ya!

Naim:          Do you have a torrent downloader?

Biegeleisen:   I not sure had might have deleted

Naim:          Alright.  So I'll Dropbox.  Got Internet?

Biegeleisen:   Yup send me both videos and we can work on plan

Naim:   Give me a few. Tell me when you're ready. I wanna hear ya when you watching.

*     *     *

Naim:   Let me know if you got it.

Naim:   Call me!

Naim:   I just want to hear reaction.

Naim:   You don't need Internet once it's on computer. So go to room

*     *     *

Naim:   Check Dropbox folder.

(Tr. at 338-42; GX 402-A.)

Next, Naim sent a JPEG image file to Biegeleisen. That image file depicted a screenshot of a video of John Doe. (Tr. at 342; GX 402-A; see also Tr. at 213; GX 523.) Their conversation then continued, as follows:

Biegeleisen:   I am on Dropbox site nothing there

Naim:   Trying again.

Naim:   Check email now

Biegeleisen:   He looks stoned

Biegeleisen:   U sent both that deff him

Naim:   Ya. Both.

Naim:   Download it. Go to room. Call me

Biegeleisen:   Which 1 first 1

Naim:   Both. Doesn't matter.

14

| Naim: | First one on list is first. |
|---|---|
| Naim: | Download so I can delete |
| Naim: | ? |
| Biegeleisen: | Y u going to delete |
| Naim: | From drop box. So I don't forget. |
| Biegeleisen: | Downloading will text u when done |
| Naim: | Pick up phone |
| Naim: | Ok. But told u it's him |
| Naim: | Watched at all? |
| Naim: | Done? |
| Naim: | No? |
| Naim: | Are you masturbating? |
| Biegeleisen: | No watched first 1 he don't masterbate |
| Naim: | Yes he does. The whole video. One has cum. Other doesn't. |
| Biegeleisen: | He fingering him self |
| Naim: | Crazy right? |
| Naim: | Are you in room? |
| Biegeleisen: | Ya |
| Naim: | Calling you in three. |
| Naim: | Hard eh. |

(Tr. at 342-44; GX 402-A.)

Also on January 21, 2013, using the email address brooklynfun123@gmail.com and the alias "Bill Howard," Naim wrote again to Johnson regarding John Doe. (Tr. at 102-03; GX 214.)

Naim wrote: "Hey. About 90- I am requesting you take it down. I know the dude personally and it would be horrifying for him and family to know this. I know it may still be elsewhere on the web but you are the source. Plus, BTW, the kid is underage. -Thanks!" (Tr. at 103; GX 214.) On January 22, 2013, Johnson responded, and stated that he had taken the videos down; Naim replied: "Thank you." (Tr. at 103, 194; GX 214.)

On January 29, 2013, Biegeleisen asked Naim if he still had the two videos of John Doe; Naim stated that he did, and he posted the videos (bow0090.avi and bow0091.avi) to Dropbox for Biegeleisen to view again. (See Tr. at 344-45; GX 402-A.)

6.    Third Video of John Doe

Naim continued to communicate with Johnson regarding John Doe and regarding other child pornography videos. On January 30, 2013, Naim sent an email to Johnson with the subject line "Preview." (Tr. at 103-04; GX 215.) Naim wrote: "hey. im thinking of $50 to donate directly. But also wondering what you go on files. And thanks again for removing 90. Guess only two with him." (Tr. at 104; GX 215.) Johnson responded to Naim's email, and attached ten "sample" images, with the file names "bow-x1.avi" through "bow-x10.avi." (See Tr. at 104-06; GX 215.) Johnson stated that he had no way "to do direct donations sadly, so amazon gift cards right now are the best way to do things." (Tr. at 104; GX 215.) Naim wrote back: "wow – first off, we need some of these as freebies! :) secondly, I like. Alright, gonna consider it. Though I hope you do post one of these bad boys up. So much sucking." (Tr. at 106; GX 215.) Johnson replied: "Well that kinda ruins the whole fun of offering them this way :) that way the people that have donated get something that not everyone else will." (Tr. at 106; GX 215.) Naim responded: "An idea. To increase more. Show one of them and say you are getting this type." (Tr. at 106; GX 215.) Johnson then wrote: "I've already had an amazing amount of response

16

from it already, so it's fine this way :)." (Tr. at 106; GX 215.)

On February 6, 2013, Naim turned the discussion back to John Doe, and they continued to exchange emails comprising the following content:

> Naim: Hey. You have more of [john]? Number 90. I know you had two before was asked to take down.
>
> Johnson: Sadly not. All I had were the 2.
>
> Naim: Hmmm. Think you can get another one?
>
> Johnson: There's always a possibility.
>
> Naim: Ok. Then that's my request for incentive.
>
> Johnson: He's still speaking to me so there's definitely a chance lol.
>
> Naim: Ha. Where does he think you're from? Ok. If you can get one or two more ill go for it.
>
> Johnson: "Anna" is from California :)
>
> Naim: Ha. Alright. Let me know if you can get one or two more with him.
>
> Johnson: Will keep you posted.
>
> Naim: You rock. If you do it, then ill chime in.

(Tr. at 107-09; GX 215.)

The final email in the list above ("You rock. If you do it, then ill chime in.") was sent by Naim at 9:06 p.m. on February 6, 2013. (See GX 215.) Having received no response in the interim, Naim followed up the following evening, February 7, 2013, at 6:18 p.m. Naim wrote: "Any news?" (Tr. at 109; GX 215.) Johnson responded: "He hasn't spoken to me lately... so just waiting to hear again." (Tr. at 109; GX 215.) Naim replied: "Alright. Keep me posted. Ill even double." (Tr. at 109; GX 215.)

17

At 11:10 p.m. that same day, Johnson informed Naim: "I have another of him :)."

(Tr. at 109; GX 215.)

Their email chain then continued as follows:

| | |
|---|---|
| Naim: | OMG.  Happened tonight?  How long? |
| Johnson: | It's roughly 15 minutes.  Has some ass play.  Had him strip slowly.. started with the pants, played through the underwear some.  Then he poked it out one of the legs of his underwear and played that way, then took them off, then the shirt.  Fingered himself some, laying down while jerking, then he bend over and did it for a bit.  Finally came on himself and then tasted it :) |
| Naim: | What time did this happen?  And what do I owe and how |
| Johnson: | Less than an hour ago, lol.  Can you do newegg gift card?  Would be awesome if you could do 100.. then I could gladly get a few more of him for you :) may even take a few requests and see if he'll do them. |
| Johnson: | If you DO decide to do $100, do it $50 at a time, that way they don't have to do any kind of 24-48 hour verification.  Much less of a hassle that way :) |
| Naim: | Hmm.  Just this one for now.  Don't know if ill want more yet |
| Johnson: | Well, $50 would be great like you said originally if that's cool unless I misunderstood what you meant? |
| Naim: | I thought one video is 10.  Double meant 20.  That's what I meant. |
| Johnson: | Well, $10 it is then :P  $20 would be nice if you felt like being a little extra generous, since I basically did him just for you lol |
| Naim: | You got it.  And I can do newegg online? |

(Tr. at 109-11; GX 215.)

18

Johnson and Naim discussed the logistics of payment, and engaged in further negotiation over what videos Naim would receive from Johnson and at what price. (See Tr. at 112; GX 215 (Naim: "OK. Gonna go with the recorded one plus video 1 & 2. Will do $30. And if you can send a bonus of video 9 – it will make me very happy. Plus, it will encourage me to do more next week. Please."; Johnson: "I'll do the bonus if you can do newegg for me"; Naim: "Alright. So 1, 2, 9 (bonus). Plus [John]. I also aiming for 5 but guess thats for next time. Rest not interested.").) On February 10, 2013, Naim purchased a $30 gift certificate on the website Newegg.com (an online consumer electronics retailer), good for purchasing merchandise on that website, and he sent the gift certificate to Johnson. After Johnson received the funds, he sent Naim an email containing zippyshare[10] hyperlinks enabling Naim to access files labeled "bow-x1," "bow-x2," "bow-x9," and "[John]." (Tr. at 113-16, 192, 225-34, 236-40; GX 215; GX 703; GX 701; see also Tr. at 596 (Naim admitted that he received videos from Jonathan via zippyshare file).) Later that day, Naim and Johnson engaged in some discussion regarding additional "samples" and the quality of the videos Johnson had sent to Naim. (See Tr. at 116-21; GX 215.)

Forensic evidence confirmed that Naim downloaded these video files, each consisting of child pornography content, on February 10, 2013.[11] (See Tr. at 349, 364-69, 389-90, 572-76; GX 501-B; GX 501-C; GX 502-D; GX 502-E; GX 502-F; GX 502-R; GX 503; GX 503-X; GX 507; GX 507-X; GX 508; GX 508-X; GX 509; see also Tr. at 357-60 (explaining

---

[10] Zippyshare is a file-hosting software that facilitates file-sharing. The sender uploads files to the particular zippyshare link and then sends that link to the recipient; the recipient can then access the link and retrieve the files. (Tr. at 91, 116.)

[11] The new video of John Doe was approximately 18 minutes long, and portrayed John Doe masturbating, inserting his fingers into his anus, ejaculating on himself, and tasting the ejaculate, consistent with Johnson's description in the email to Naim. (See Tr. at 575; GX 215.) The file name of the video, as located on Johnson's computer, was "vcam_skype – 15 yo [john] strips, plays through underwear, fingers, comes on self, tastes it.avi." (See Tr. at 511-12.)

significance of "created" dates).) Forensic evidence also indicated that Johnson had created the new video of John Doe at approximately 10:12 p.m. on February 7, 2013, using Skype and the user name "JennaHottie2010." (Tr. at 511-14; GX 503; GX 605-A; GX 605-B; GX 658-R.) Additionally, a review of Johnson's email account corroborated that Johnson had made the John Doe video "basically . . . just for" Naim, as no other requests for a video of John Doe, of "90," or of "91" were located in the email account. (Tr. at 588.)

Also on February 10, 2013, Naim sent an iMessage to Jerry Biegeleisen. (Tr. at 346; GX 402-A.) Naim wrote to Biegeleisen: "Ok. I won't tell ya that [john] now has a third video up." (Tr. at 346; GX 402-A.)

### 7. Requests for Fourth Video of John Doe

A few days later, on February 14, 2013, Naim again reached out to Johnson, asking: "<u>Can we do another [john]?</u>" (Tr. at 122; GX 215 (emphasis added) (first request for fourth John Doe video).) Johnson replied: "I'll keep you posted. He seems a little mad at me right now, lol." (Tr. at 122; GX 215.) Naim asked: "Why." (Tr. at 122; GX 215.) Johnson replied: "Lol I'm not sure.. you know how teenagers can be sometimes." (Tr. at 122; GX 215.) Naim responded: "Guess so." (Tr. at 122; GX 215.)

On March 5, 2013, Naim received an email from boysonwebcam@gmail.com, announcing new URLs for Johnson's website. (Tr. at 124-25; GX 218.) Naim responded to the email on March 8, 2013, and he asked Johnson: "How's it going? Happy? Sites moving?" (Tr. at 126; GX 218.) Approximately ten minutes later, Naim wrote again, stating: "Still prepping eh." (Tr. at 126; GX 218.) On March 11, 2013, Johnson responded: "Mostly just trying to get advertising up and around right now to get my traffic back." (Tr. at 126; GX 218.) On March 12, 2013, Naim continued the conversation: "I gotcha. Redirect domain?" (Tr.

at 126; GX 218.) Johnson replied: "That would be pointless, because then the people who got me shut down in the first place would know I was up again." (Tr. at 126; GX 218.) Naim wrote again the following day, March 13, 2013, noting in consecutive emails: "good point," and "name kinda hard to remember." (Tr. at 126-27; GX 218.) Two days later, March 15, 2013, Johnson responded, "yeah :(." (Tr. at 126; GX 218.) Then, on March 18, 2013, Naim sent another email to Johnson, bringing the topic back to John Doe: "hey think you can get [john] again." (Tr. at 127; GX 218 (emphasis added) (second request for fourth John Doe video).)

On March 23, 2013, Naim sent an email to Johnson with the subject line: "So annoying." (Tr. at 130; GX 219.) Naim asked: "what happen now? how did they find you? and argh. You have so much videos still to post right? I click on ads for you and such." (Tr. at 130; GX 219.) On March 27, 2013, Naim reached out to Johnson again, and sent Johnson an email with the subject line "came back?" (Tr. at 130; GX 220.) Naim wrote: "guess you are fighting the enemies eh?" (Tr. at 130; GX 220.) Johnson responded the following day, at 12:35 a.m., stating: "yep, seem to actually be winning this time around too." (GX 220.) Naim replied almost immediately (at 12:59 a.m.), stating: "Sweetness. Saw the new vids. You rocking." (Id.) Using the same email chain, Naim wrote again to Johnson two days later, March 30, 2013. Naim asked: "Hey. think you can get [john] again?" (GX 220 (emphasis added) (third request for fourth John Doe video).)

Throughout April 2013, Naim continued to write to Johnson regarding BoysOnWebcam, and he continued to seek additional videos. (See Tr. at 131-33; GX 221; GX 222; GX 223; GX 224-R.) For example, on April 3 and 4, 2013, Naim and Johnson exchanged emails regarding BoysOnWebcam's hosting problems. (Tr. at 131; GX 221 (Naim: "site down?"; Johnson: "Unfortunately. The host claimed they were willing to work with me, but I guess not.";

Naim: "Headaches eh. What will you do now?"; Naim: "so are you giving up?"; Johnson: "Looking for another host yet again."; Naim: "argh – hmmm, how many videos do you have on stand by?").) On April 12, 2013, Naim reached out again, noting: "Such pains eh." (Tr. at 131; GX 222.) On April 18, 2013, Naim wrote yet again, in an email with the subject line "news?" (Tr. at 131; GX 223.) Naim stated: "hey / been trying to reach you. any news? and if not – do you have more videos?" (Tr. at 131; GX 223.)

On April 21, 2013, Naim again contacted Johnson regarding the website (via Google Chat), and Johnson responded. (See Tr. at 132; GX 224-R.) Johnson informed Naim that he had been "trying to work on getting the sites back up this weekend," and that "the old host is not letting me change the stuff i need to so i can get the sites up again." (Tr. at 132; GX 224-R.) Naim asked: "in the meantime you got more videos?" (Tr. at 132; GX 224-R.) Johnson replied: "yes but i have more important stuff to worry about lol." (Tr. at 132; GX 224-R.)

Naim wrote back and suggested "a tradeoff like before?" (Tr. at 132; GX 224-R.) Naim attempted to negotiate with Johnson, noting that "30 gave me 10 videos last time / actually 20 did / but ill do 30." (Tr. at 133; GX 224-R.) Johnson responded: "im going back to 10/vid from now on when or if i offer that again, because the ones i have now are even better than the previous ones." (Tr. at 133; GX 224-R.) Their chat conversation then continued as follows:

| Naim: | i see |
| Naim: | so i wouldnt be able to now? |
| Johnson: | nah let me get all the sites up and running first at least |
| Johnson: | because I need actual $$ right now, not amazon $$ |
| Naim: | id be down for that |
| Naim: | paypal or sucj |

| | |
|---|---|
| Naim: | direct to u |
| Naim: | but ok |
| Johnson: | would have to be payza |
| Johnson: | since the trolls got me banned from paypal |
| Naim: | i seriously don't know any site that does what you do… |
| Naim: | oh |
| Naim: | no problem |
| Naim: | i just like new vids |
| Naim: | in the meantime…where else can I go?  you would know |
| Johnson: | well the ones i have now are good |
| Johnson: | honestly i don't know other sites that do what i did either lol |
| Naim: | ha |
| Naim: | exactly |
| Naim: | everything is typcal |
| Naim: | not fun |
| Naim: | guess you don't want to do this now? |
| Johnson: | well i got a little free time |
| Johnson: | give me a bit and ill throw together some screenshots |
| Naim: | sounds good |
| Naim: | and if you can do me a deal |
| Naim: | 30 for 5 |

| | |
|---|---|
| Naim: | id be really happy |
| Naim: | you know im a fan |
| Naim: | and a repeat buyer |
| Johnson: | yeah but im in desperate need lol and i already gave you a pretty damn good deal on the last batch |
| Naim: | you def did |
| Naim: | well |
| Naim: | consider this bro |
| Naim: | once i am done with these |
| Naim: | i be back soon again |
| Naim: | cuz u do take care of me |
| Johnson: | alright |
| Naim: | ya |
| Naim: | so i am on |
| Naim: | let me know what you go |
| Naim: | and ill decide within mins |
| Naim: | and lets make it happen |
| Naim: | and btw – llet me know if you ever get that [john] dude again |
| Johnson: | hes pretty much thrown in the towel on being on cam i think so probably won tbe getting any more of him |
| Naim: | i gotcha |
| Naim: | but if u do |
| Naim: | let me knjow |

(Tr. at 133-35; GX 224-R (emphases added) (fourth request for fourth John Doe video).)

Johnson then sent Naim a hyperlink and wrote "previews." (Tr. at 135; GX 224-R.) Naim asked Johnson about several of the videos; eventually, Naim requested three specific videos and also asked Johnson to include two others of Johnson's choice, and they discussed payment for the five videos. (Tr. at 135-38; GX 224-R.) Johnson asked Naim: "how much do you wanna do." (Tr. at 138; GX 224-R.) Naim responded: "we said 30 for 5 this time." (Tr. at 138; GX 224-R.) Johnson noted that he "was hoping for a little more but i guess ill take what I can get." (Tr. at 138; GX 224-R.) Naim agreed to pay Johnson for the videos via a website or web application called "payza," but ultimately Naim did not do so because he could not use his American Express card. (Tr. at 137-40; GX 224-R.) Naim and Johnson then discussed other possible ways Naim could pay Johnson for the videos, including by purchasing a MoneyPak prepaid card. (Tr. at 137-45; GX 224-R.) When Johnson noted that "with no ad $$ coming in 3 weeks, down to almost no funds and need to pay for internet and such," Naim suggested that perhaps he could "pay one of your bill directly?" (Tr. at 144; GX 224-R.) Eventually, Naim asked Johnson to "trust that I will get this done for you within 72 houors…and send me one video for now? :) / the making out one…:) / and i will do 40." (Tr. at 144; GX 224-R.) Johnson sent Naim hyperlinks so that Naim could download one video; after beginning to view that video and commenting on its quality, Naim noted: "i think [john] was best qaulity wise." (See Tr. at 145-48; GX 224-R.)

The remainder of Naim's conversations with Johnson consisted generally of the two men discussing BoysOnWebcam hosting issues, Naim promising to pay Johnson the $40 Naim owed him, Johnson complaining about his accounts being blocked, Naim asking Johnson about payment options, and Naim asking about obtaining new videos. (See Tr. at 148-61.) Among

these conversations, Johnson informed Naim on at least one occasion that he was still actively creating or seeking to create new videos. (See Tr. at 154; GX 228 (Naim: "what are you up to"; Johnson: "out looking for 'models' :)").)

8.    Execution of Search Warrants and Naim's Confession

Federal agents executed a search warrant on Johnson's residence on May 15, 2013, and they adopted Johnson's email persona the same day. (Tr. at 55-59, 199.) Accordingly, any email communications between Naim and boysonwebcam@gmail.com that occurred after that date were actually sent or received by those agents. (Tr. at 162-63, 199-200.) For example, on May 30, 2013, Naim wrote to boysonwebcam@gmail.com, and asked: "any news?" (Tr. at 162; GX 230.) Naim wrote again on June 9, 2013, and stated: "Hey dude. Are you alright?" (Tr. at 162; GX 231.) Naim continued to attempt to contact Johnson in August 2013, and eventually law enforcement agents began to respond, pretending to be Johnson. (See Tr. at 163-70; GX 153-A; GX 171; GX 172.) Naim continued to ask for new videos (Tr. at 165-70; GX 153-A; GX 171; GX 172), but during the time that law enforcement agents controlled Johnson's account, no videos containing child pornography content were sent to Naim by boysonwebcam@gmail.com, pursuant to law and agency policy. (Tr. at 201.)

On September 18, 2013, at approximately 6:05 a.m., law enforcement agents executed a search warrant on Naim's residence. (E.g., Tr. at 291-92, 589.) They retrieved electronic equipment from Naim's bedroom, including Naim's iPhone, laptop computer, router, and modem. (See Tr. at 291-98, 327-31, 346-51, 558-59, 594.) Naim was not under arrest, and he voluntarily spoke with law enforcement agents that morning. (Tr. at 593-94.) Naim's confession to those agents was entered into evidence at trial.

Special Agent Christopher McClellan testified that Naim admitted that there was a video

of a boy named John on his laptop; that he knew John personally; and that he knew John because John had attended a camp for children with cancer at which Naim had worked. (Tr. at 594, 597-98.) Naim also admitted that he believed John was approximately 15 or 16 years old when the video was made. (Tr. at 594.) Later, Naim disclosed that there were in fact three videos of John on his laptop. (Tr. at 597-98.)

Furthermore, Naim told McClellan that other videos were also on his computer, and he explained that he had obtained these videos from a man named Jonathan, who ran a website called "BoysOnWebcam." (Tr. at 595.) Naim told McClellan that he believed Jonathan obtained the videos by pretending to be a female, and by using a video of a female to get the boys to make the videos. (Tr. at 596.) Naim also admitted that he had purchased videos from Jonathan. (Tr. at 596.) Naim informed McClellan that Naim had asked Jonathan to have a video made of John, and that Naim paid for that video using a Newegg.com gift card. (Tr. at 596.) Naim admitted that he used the email accounts naimroy@gmail.com and brooklynfun123@gmail.com, and that he was the only person with access to those accounts. (Tr. at 596.) Naim provided McClellan with the passwords to both email accounts. (Tr. at 597.)

Forensic evidence obtained through the search of Naim's residence indicated that two of the three most recently accessed video files on Naim's computer were child pornography videos of John Doe. (Tr. at 401-02; GX 524.)

## II.     STANDARDS OF REVIEW

### A.     Federal Rule of Criminal Procedure 29

A defendant may move or renew a motion for a judgment of acquittal after the jury has rendered a guilty verdict, on the grounds that the evidence entered at trial is insufficient to sustain the conviction. See Fed. R. Crim. P. 29(a), (c). A defendant challenging his conviction

on sufficiency grounds "bears a 'heavy burden.'" United States v. Anderson, 747 F.3d 51, 59 (2d Cir. 2014) (quoting United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009)). In order to grant a motion for a judgment of acquittal, the court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citation omitted). The "conviction must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Celaj, 649 F.3d 162, 168 (2d Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The court must consider the evidence presented at trial "in the light most favorable to the government," Guadagna, 183 F.3d at 129 (citing Jackson, 443 U.S. at 307), and "must credit every inference that the jury may have drawn in favor of the government," United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001) (internal quotation marks and citation omitted). "To sustain the jury's verdict, the government need not disprove 'every possible hypothesis' of the defendant's innocence." Anderson, 747 F.3d at 60 (quoting United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998)). Furthermore, the facts should not be viewed in isolation; rather, the evidence must be assessed as a whole. Celaj, 649 F.3d at 167; United States v. Young, 745 F.2d 733, 762 (2d Cir. 1983).

Moreover, the court must be mindful "to avoid usurping the role of the jury." Guadagna, 183 F.3d at 129. "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. (internal quotation marks and citation omitted); see also Anderson, 747 F.3d at 60 ("[I]t is the task of the jury, not the court, to choose among competing inferences that

28

can be drawn from the evidence."); United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006). The court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." Guadagna, 183 F.3d at 129 (internal quotation marks and citations omitted). If the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and citation omitted).

## B.      Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 1997). "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal citation omitted). The Second Circuit has stated that a district court should exercise such discretion only "in the most extraordinary circumstances." United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993); see also, e.g., United States v. Torres, 128 F.3d 38, 48 (2d Cir. 1997).

In evaluating a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." Ferguson, 246 F.3d at 134. "[T]he court is entitled to weigh the evidence and in so doing evaluate for itself the

credibility of the witnesses." Sanchez, 969 F.2d at 1413 (internal quotation marks and citation omitted). However, the "district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usur[ping] the role of the jury.'" Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120). For this reason, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment," such as "[w]here testimony is patently incredible or defies physical realities." Sanchez, 969 F.2d at 1414.

Ultimately, the court should deny the Rule 33 motion if it is "satisfied that competent, satisfactory, and sufficient evidence in the record supports" the jury verdict. Id. A new trial should only be granted if an evaluation of the evidence results in "a real concern that an innocent person may have been convicted." Id.

## III. DISCUSSION

Naim challenges his conviction on Count Three, the attempted sexual exploitation of John Doe. "In order to establish that a person is guilty of an attempt to commit a crime, the government must prove that he '(1) had the intent to commit the crime'"—here, producing child pornography in violation of 18 U.S.C. § 2251(a)—"'and (2) engaged in conduct amounting to a "substantial step" towards the commission of the crime.'" United States v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993) (quoting United States v. Martinez, 775 F.2d 31, 35 (2d Cir. 1985)). Naim argues that the Government did not prove beyond a reasonable doubt either of these elements. Specifically, Naim contends that (1) the Government failed to prove that Naim "was attempting . . . to create a video of [John] rather than simply seeking to purchase one," and (2) the Government's "reliance on the mere communication between [D]efendant and Johnson does not suffice to establish a substantial step" under relevant case law. (Mem. of Law in Supp. of Def.

30

Mot. ("Def. Mem.") (Dkt. 110-2) at 4, 6.)

## A. Intent

To convict a defendant of production of child pornography in violation of 18 U.S.C. § 2251(a), the prosecution must prove beyond a reasonable doubt that: "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." United States v. Broxmeyer, 616 F.3d 120, 124 (2d Cir. 2010) (internal quotation marks and citation omitted). Accordingly, to convict Naim of the attempted violation of the statute, the Government was required to prove in relevant part that Naim intended to "use[], employ[], persuade[], induce[], entice[], or coerce[]" John Doe to "take part in sexually explicit conduct for the purpose of producing any visual depiction of that conduct."[12] Id.; see also 18 U.S.C. §§ 2251(a), 2251(e).

### 1. Production Versus Purchase

Naim's argument relates to the second half of this formulation. He focuses on the difference between the intent to produce, or "create," an item (here, a sexually explicit video) and the intent to "purchase" the same; he argues that the evidence showed only that he had the intent to purchase a video of John Doe, not the intent to create one. (See Def. Mem. at 4-5.) Naim's argument is unavailing.

The conduct at issue in Count Three centers on Naim's several requests for a fourth video of John Doe, which Naim made to Johnson on February 14, March 18, March 30, and April 21, 2013, after having successfully obtained a third video of John Doe after a similar prior request.

---

[12] Naim does not contend that the Government failed to prove that John Doe was a minor, that the interstate element of the violation was not satisfied, or that the video would not have contained child pornography content.

However, as the Government correctly notes, the jury was entitled to consider Naim's full course

of conduct and the entirety of his relationship with Johnson in determining whether Count Three

was proven beyond a reasonable doubt. (See, e.g., Tr. at 801 ("In determining whether the

defendant took a substantial step towards the commission of a crime, you should consider all of

the evidence . . . admitted in the case concerning the defendant and the alleged commission of

the crime." (court's jury charge as to Count Three)).) Cf. United States v. Farhane, 634

F.3d 127, 144 (2011) ("[T]he reviewing court [on a Rule 29 motion] must consider the totality of

the evidence in the light most favorable to the prosecution . . . .").

Viewed in the light most favorable to the Government, the evidence at trial

overwhelmingly established that at the time Naim requested a fourth video of John Doe, Naim

knew that Johnson did not obtain his videos from another source. Naim knew that Johnson

filmed the boys himself, using a fictitious female persona. Indeed, over the course of their

communications, Naim repeatedly expressed his approval and appreciation for Johnson's

methods. Naim also knew that Johnson had no additional, pre-recorded videos of John Doe that

Naim had not yet seen. Accordingly, Naim knew that in order for Johnson to send him a new

video of John Doe, Johnson would have to engage with John Doe, convince John Doe to take

part in sexual activity before the webcam, and surreptitiously record that activity.

Some of this knowledge was obtained, and the rest reinforced, by Naim's experience

when he first requested a new video of John Doe from Johnson, on February 6, 2013, an

experience that proved successful. Naim specifically asked Johnson if he had any additional

videos of John Doe, and Johnson informed him that he did not. (Tr. at 107; GX 215.) From that

alone, the jury reasonably could have concluded that Naim understood that any new videos

would require creation, that is, production. After obtaining this knowledge, Naim asked Johnson

32

if he could "get another one" and repeatedly encouraged Johnson to do so. (See Tr. at 107-09; GX 215 ("Then that's my request for incentive."; "Ok. If you can get one or two more ill go for it."; "Let me know if you can get one or two more with him."; "If you do it, then ill chime in"; "Ill even double.").) In the course of this conversation, Naim and Johnson referred to the way that Johnson would "get" another video or two—by taking on a female persona and filming John Doe. (See Tr. at 107-08; GX 215 (Johnson: "He's still speaking to me so there's definitely a chance lol."; Naim: "Ha. Where does he think you're from?"; Johnson: "'Anna' is from California."; Naim: "Ha.").) It would have been reasonable for the jury to conclude that even at this time Naim had the intention to have another video of John Doe created—not merely the intention to purchase another video—and that Naim had that same intention when he made his subsequent requests for a fourth video.

Moreover, in response to Naim's February 6 and 7, 2013, requests for a third video, Johnson did produce a new video of John Doe for Naim, and Naim learned almost immediately thereafter that this had occurred. Johnson told Naim that he had filmed that video of John Doe specifically for Naim (Tr. at 111; GX 215 ("I basically did him just for you lol")), and that the video had been recorded "[l]ess than an hour ago, lol." (Tr. at 100; GX 215.) Naim knew all of this prior to his subsequent requests for a fourth video.

With all of this knowledge, Naim asked Johnson—four different times—if Johnson could and would create a fourth video of John Doe. Only four days after receiving the third video of John Doe, which Naim knew had been specifically made for him, Naim asked Johnson: "Can we do another [john]?" Johnson responded: "I'll keep you posted." (Tr. at 122; GX 215.) Approximately a month later, in mid-March, Naim followed up: "hey think you can get [john] again." (Tr. at 127; GX 218.) Again on March 30, 2013, Naim asked: "Hey. think you can get

33

[john] again?" (GX 220.) And yet again in April, Naim broached the topic: "and btw – llet me know if you ever get that [john] dude again." (Tr. at 135; GX 224-R.) When Johnson noted that John Doe had "pretty much thrown in the towel on being on cam i think so probably won tbe getting any more of him," Naim replied, "i gotcha / but if u do / let me knjow." (Tr. at 135; GX 224-R.)

The jury was thus presented with substantial evidence that Naim fully understood the situation at hand. Specifically, the jury learned that Naim knew that Johnson created the videos he distributed, including those of John Doe, by posing as a female on the Internet; that Johnson did not have any additional previously recorded videos of John Doe; that in the very recent past, Johnson had sought out and recorded a new video of John Doe in response to Naim's request; and that Johnson had been in contact with John Doe and successfully recorded a new exploitative video of him as recently as February 7, 2013. The jury also heard that Naim admitted to law enforcement agents that he had asked Johnson to make a video of John Doe, and that Naim paid for that video. (Tr. at 596.) This evidence was far more than sufficient for the jury to have reasonably concluded, beyond a reasonable doubt, that at the time Naim made any, or all, of his four separate requests for a fourth video of John Doe, Naim had the desire and intent to have a new exploitative video of John Doe made—not merely the intent to purchase a video.

Importantly, the jury rejected the very argument that Naim raises in his Rule 29 motion. In summation, Naim's trial counsel implored the jury:

> My client sent e-mails to boysonwebcam@gmail.com asking have you got anything? I'm interested. I'm a buyer. He did not take action to create or produce child pornography.
> My wife likes to go to qvc.com and she looks and browses and sometimes they don't have a particular item that my wife is interested in purchasing, so she's put on a wait list because the item is not available for sa[le] right away.
> My wife will contact qvc.com. Do you have it now? Is

34

that item available? That doesn't mean that my wife . . . is attempting to produce that item because that item is not there at the moment and that item cannot be obtained at the moment. Notwithstanding the fact that there are inquiries about when is the item going to be available? Anything new on this particular item? Do you think you'll be getting more stock? This does not result in an attempt. This is chatter involving a consumer, a purchaser, and a purveyor. . . .

My client was a buyer of videos. He was interested in acquiring videos, not producing videos.

(See Tr. at 744-45 (closing argument); see also Tr. at 50-52 (opening argument) (raising similar argument with respect to buyer of marijuana, and viewer of Hollywood film).)

It was not unreasonable for the jury to reject Naim's argument. There is an important flaw in Naim's analogy as applied to the facts of this case. A consumer who may visit a typical retail website, functioning in ordinary commerce, and who may place his or her name on the wait list for a particular item, does not ordinarily anticipate that his or her individual interest will prompt the production of that item. The consumer instead likely expects that particular mass-produced item to be produced (or not, if the "season" for such item has ended) regardless of whether he or she joins the wait list. Placing his or her name thereon simply ensures that one such item is set aside for that individual to purchase whenever it does become available. Production of the item may even be underway already, although not yet complete.

The situation here was markedly different. Naim had a great deal of relevant knowledge, as explained in detail above. Pursuant to that knowledge, Naim had reason to believe that his request or requests would cause the creation of a new video of John Doe. In other words, Naim had reason to believe that but for Naim's request, Johnson would not be likely to actively seek out another chat session with John Doe, and John Doe would not be further exploited by Johnson. It was reasonable for the jury to determine, given the evidence in the case, that Naim had the intent to create a new video of John Doe; and the court will not disturb that reasonable

35

determination. See United States v. Crowley, 318 F.3d 401, 409 (2d Cir. 2003) ("[T]he question of [the defendant's] intention is primarily one of inference from his actions, and thus one especially suited for resolution by a trial jury." (citing Cheek v. United States, 498 U.S. 192, 203 (1991); United States v. Brandt, 196 F.2d 653, 657 (2d Cir. 1952))); see also Finley, 245 F.3d at 202 (noting that on a Rule 29 motion, the court must credit all inferences that the jury could have reasonably drawn in the Government's favor); Guadagna, 183 F.3d at 129.

      2.    Adult Intermediary

The question discussed directly above—whether the evidence established that Naim had the intent to "create," as opposed to "purchase," an exploitative video of John Doe—is related to another important issue in this case: whether a defendant can violate § 2251 through communications made solely with an adult intermediary. Naim's briefing does not directly address this question, although the Government does so in its opposition. As previously discussed, to prove Naim's guilt on Count Three, the Government was required to prove that Naim intended to "use[], employ[], persuade[], induce[], entice[], or coerce[]" John Doe to "take part in sexually explicit conduct for the purpose of producing any visual depiction of that conduct." Broxmeyer, 616 F.3d at 124; see also 18 U.S.C. §§ 2251(a), 2251(e). This court concludes that a defendant can violate the statute solely through communications with an adult intermediary, and that the evidence put forth at Naim's trial was sufficient for the jury to find that Naim engaged in his communications with Johnson with the intent to "use[], employ[], persuade[], induce[], entice[], or coerce[]" John Doe into engaging in sexual activity for the purpose of producing child pornography.

The Second Circuit has not considered whether § 2251(a) prohibits producing child pornography through an adult intermediary. The two federal courts of appeals to have done so

36

have answered in the affirmative. See United States v. Pavulak, 700 F.3d 651 (3d Cir. 2012); United States v. Lee, 603 F.3d 904 (11th Cir. 2010). The Second Circuit has held that a defendant may be convicted for violation of 18 U.S.C. § 2422(b)—another statute directed at child exploitation, and one containing language similar to § 2251(a)—solely on the basis of communications with an adult. See United States v. Douglas, 626 F.3d 161 (2d Cir. 2010) (per curiam) (holding that a defendant may be convicted of criminal enticement of a minor in violation of § 2422(b) by communicating solely with the minor's adult guardian). Every other circuit to have considered this issue with respect to § 2422(b) has held the same. See United States v. Olvera, 687 F.3d 645, 647 (5th Cir. 2012); United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011); United States v. Nestor, 574 F.3d 159, 160-62 (3d Cir. 2009); United States v. Spurlock, 495 F.3d 1011, 1013-14 (8th Cir. 2007); United States v. Murrell, 368 F.3d 1283, 1287 (11th Cir. 2004); cf. United States v. Laureys, 653 F.3d 27, 33 (D.C. Cir. 2011) (affirming conviction involving communications with adult intermediary on plain error review).

Section 2422(b) prohibits the criminal enticement of a minor. The statute provides that "[w]hoever . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished by fine and imprisonment. Douglas, 626 F.3d at 164 (quoting § 2422(b)). In Douglas, the defendant had communicated in an Internet "fetish" chat room with a detective who was posing as a 38-year old woman ("Liz") with a 13-year old daughter ("Anna"); over a series of communications, the defendant told Liz he would provide Anna with sexual "training" of various sorts, without harming Anna, and he promised cash payments in return for access to the teenage girl. Id. at 162. A jury convicted the defendant of attempting to entice a minor to engage in illegal sexual

37

activity. Id. at 163. The Second Circuit rejected the defendant's argument that § 2242(b) required his communications to be directed to the minor, because the minor "is the only identified direct object of the active verbs listed" in the statute. Id. at 164 (internal quotation marks and citation omitted). Instead, the Second Circuit explained that the statute criminalized "obtaining or attempting to obtain a minor's assent to unlawful sexual activity," and held that "[s]uch assent might be obtained, for example, by persuading a minor's adult guardian to lead a child to participate in sexual activity." Id. at 164. The court also noted that "the efficacy of § 2422(b) would be eviscerated if a defendant could circumvent the statute simply by employing an intermediary to carry out his intended objective." Id. at 165.

For several reasons, the court concludes that Naim's conduct in the instant case (viewing the evidence in the light most favorable to the Government) extends to §§ 2251(a) and (e). First, under the theory found viable in Douglas, the evidence in this case was sufficient for the jury to find that Naim had the intent to "persuade[], induce[], entice[], or coerce[]" John Doe through the use of Johnson, an adult intermediary. Section 2251(a) prohibits convincing a minor to engage in sexual activity (for the purpose of producing child pornography, but the minor need not be aware of this purpose), and Naim could have obtained John Doe's assent to engage in sexual activity in front of his webcam by persuading or encouraging Johnson to resume his contact with John Doe. Based on his prior interactions with Johnson, Naim had reason to believe that Johnson, who had previously convinced John Doe to engage in such sexual activity, exerted influence over John Doe sufficient to lead to this result. See, e.g., Murrell, 368 F.3d at 1287 ("[Defendant] communicated with an adult who . . . presumably exercised influence over the girl." (discussing § 2242(b) conviction)).

Second, when previously construing § 2251(a), the Second Circuit has noted that

38

"persuade," "induce," and "entice" are all "words of causation." Broxmeyer, 616 F.3d at 125; see also Murrell, 368 F.3d at 1287 (in connection with § 2242(b) prosecution, defining "induce" to mean "[t]o stimulate the occurrence of; cause"). As discussed above, Naim had every reason to believe that his request for a third video of John Doe caused the creation of that video, and that but for that request Johnson would not have sought out John Doe and recorded this video. The jury could have easily inferred that Naim then made his requests for a fourth video with the intent to cause, or bring about, the creation of that video.

Third, the statute at issue here is even broader than the statute at issue in Douglas, as it includes two verbs that are absent from § 2242(b). Section 2251(a) and (e) not only prohibits a defendant from attempting to "persuade[], induce[], entice[], or coerce[]" a minor into creating child pornography, but also criminalizes "attempting to 'employ[] [or] use' a minor for the purpose of producing child pornography." Lee, 603 F.3d at 913 (quoting 18 U.S.C. § 2251(a)); see also United States v. Sirois, 87 F.3d 34, 41 (2d Cir. 1996) (holding that the meaning of the term "use" in § 2251(a) is "within the typical juror's everyday understanding of the word," and that the act of photographing a child for the purpose of creating child pornography constitutes such "use"). One ordinary meaning of the word "employ" is to "make use of." Merriam-Webster's Collegiate Dictionary at 379 (10th ed.). As a matter of plain language, the jury reasonably could have concluded that in intending to have Johnson record a new video of John Doe for Naim's viewing pleasure, Naim intended to "make use of" John Doe.

Finally, "[i]n enacting 18 U.S.C. § 2251, 'Congress intended a broad ban on the production of child pornography and aimed to prohibit the varied means by which an individual might actively create it.' . . . The inclusion of multiple similar verbs in the statute illustrates Congress'[s] intent to reach as broad as possible a range of ways that a defendant might actively

39

be involved in the production of sexually explicit depictions of minors." Ortiz-Graulau v. United States, 756 F.3d 12, 19 (1st Cir. 2015) (quoting United States v. Poulin, 631 F.3d 17, 23 (1st Cir. 2011)). Accordingly, a construction of §§ 2251(a) and (e) that reaches Naim's conduct in this case—conduct that represents one way in which an individual could actively be involved in the production of child pornography—is consistent with the purpose of the statute. If the exploitation would not have occurred but for the defendant's actions, criminal liability is appropriate. See Child Protection Act of 1984, § 2(2)-(3), Pub. L. No. 98-292, 98 Stat. 204 (congressional finding that "thousands of children . . . are exploited in the production and distribution of pornographic materials" and "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the individual child and to society").

## B. Substantial Step

The Government was also required to prove beyond a reasonable doubt that Naim took action amounting to a substantial step toward the creation of a sexually explicit video of John Doe. Rosa, 11 F.3d at 337. Naim contends that his communications with Johnson were insufficient to constitute a substantial step toward the commission of the offense because Naim "merely asked for videos of" John Doe. (Def. Mem. at 7.)

The substantial step standard was intended to "'widen the ambit of attempt liability'" as compared to the common law, which had limited attempt "to conduct close to the completion of the intended crime." Farhane, 634 F.3d at 146 (quoting United States v. Ivic, 700 F.2d 51, 66 (2d Cir. 1983) (Friendly, J.), abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994)). "A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the

substantive crime." United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980). "In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." Id. at 987-88. "Conduct 'shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose.'" Ivic, 700 F.2d at 66 (quoting Model Penal Code § 5.01(2)).

This standard is "easier to state than to apply," Soares v. United States, 66 F. Supp. 2d 391, 408 (E.D.N.Y. 1991) (Raggi, J.), because "the identification of a substantial step . . . is necessarily a matter 'of degree,' that can vary depending on 'the particular facts of each case' viewed in light of the crime charged." Farhane, 634 F.3d at 147 (quoting United States v. Coplon, 185 F.2d 629, 633 (2d Cir. 1950) (L. Hand, C.J.); Ivic, 700 F.2d at 66); see also Crowley, 318 F.3d at 408 ("Determining whether particular conduct constitutes a substantial step is 'so dependent on the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts.'" (quoting Manley, 632 F.2d at 988)). "An act that may constitute a substantial step towards the commission of one crime may not constitute such a step with respect to a different crime." Farhane, 634 F.3d at 147.

Naim primarily argues that his "mere communication" with Johnson cannot constitute a substantial step because Naim "never instructed Johnson as to the taking of any action. He may have been aware of what Johnson was doing, but he never told him what to do, when to do it, or how to do it." (Def. Mem. at 6 (citing United States v. Abdallah, 528 F. App'x 79 (2d Cir. 2013) (summary order)).) He also contends that "[n]othing the [G]overnment asserts that [D]efendant did, beyond payment, ever rose to the level of action," and "nothing [D]efendant suggested or

did added one whit to Johnson's ability to create videos of" John Doe. (Id. at 6-7.)

Naim's argument misapprehends the substantive crime that provides the foundation for his attempt conviction. See Farhane, 634 F.3d at 147 ("[S]ubstantial-step analysis necessarily begins with a proper understanding of the crime being attempted."). As explained above, § 2251(a) prohibited Naim from causing the creation of an exploitative video of John Doe—and as specifically applied to the facts of this case, from causing Johnson to renew his contact with John Doe and to induce John Doe into engaging in sexual activity in front of his webcam, so that Johnson could record a new video. The question here is whether the Government proved that Naim took a substantial step toward causing that result. Naim did not have to "add . . . to Johnson's ability to create videos of" John Doe; he merely had to attempt to cause Johnson to create another video, using Johnson's tried-and-true methods.

When considering the nature of the offense at issue and the particular circumstances of this case, see Farhane, 634 F.3d at 146, the court concludes that the Government's proof was sufficient to prove that Naim took a substantial step toward commission of that offense. By early 2013, Naim had an established relationship with Johnson. Naim had engaged in numerous communications with Johnson regarding Johnson's child pornography video business. Naim had complimented Johnson's methods and product, and he repeatedly expressed support for Johnson as well as sympathy for difficulties Johnson faced with respect to hosting his website. Naim made suggestions regarding the website, and asked if he could help Johnson in any way. Even prior to Naim's first request for a new video of John Doe in February 2013, Johnson repeatedly evidenced his willingness to accommodate Naim's wishes—readily answering a number of Naim's technical questions regarding viewing the videos, removing Naim's comment to the BoysOnWebcam website pursuant to Naim's request, and most significantly, removing the initial

42

two videos of John Doe (bow0090.avi and bow0091.avi) from BoysOnWebcam. In February 2013, with their relationship established, Naim asked Johnson if he could "get another" video of John Doe. (Tr. at 107; GX 215.) Over the course of two days, Naim repeatedly encouraged Johnson to do so, and made escalating offers to pay for such a video, until Johnson informed Naim that he "ha[d] another of him." (Tr. at 109; GX 215.) Naim next paid for, and then received, the newly created video. The jury reasonably could have found that any—or all— of Naim's similar requests made a few days later, the following month, and again the month after that, constituted a substantial step toward the creation of yet another video, taking into consideration Naim's and Johnson's past course of conduct. To use one formulation, given the past communications between Naim and Johnson, the jury could have found that any of the subsequent requests made by Naim were likely to have led to the exploitation of John Doe, and indeed would have resulted in a new video had John Doe been willing to resume communications with Johnson. See Manley, 632 F.2d at 988 (approving of description of substantial step as conduct "adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime" (internal quotation marks and citation omitted)); see also United States v. McKenzie, 421 F. App'x 28, 32 (2d Cir. 2011) (summary order) (explaining that a "rational trier of fact could have relied on" evidence of prior pattern of conduct to infer that the defendant took a substantial step in furtherance of his objective).

In his briefing, Naim relies on two cases, United States v. Abdallah, 528 F. App'x 79 (2d Cir. 2013) (summary order), and United States v. Martinez, 75 F.2d 31 (2d Cir. 1985), to argue that the evidence at trial was insufficient to prove a substantial step. In both of these cases, the defendant was held to have taken a substantial step toward the commission of the offense;

43

Naim argues that the circumstances of his case are materially different. But on balance, these cases support a finding of sufficiency here as well.

First, Abdallah emphasized the importance of considering context and past events when determining whether a substantial step has been established. See 528 F. App'x at 82-83. And like the defendant in Abdallah, Naim "was not soliciting a new acquaintance to become involved in a criminal plot, nor did he withdraw from his efforts to consummate the [offense]." Id. at 83. As explained above, the jury reasonably could have concluded that by requesting a fourth (new) video after (1) developing a relationship with Johnson, (2) successfully obtaining a third (new) video, (3) paying Johnson for that video, and (4) continuing that relationship, Naim "engaged in an overt act that was, in the context of his prior dealings with [Johnson], 'adapted to, approximat[ed], and . . . in the ordinary and likely course of things w[ould] result in, the commission of the particular crime.'" Id. (second and third alterations in original) (quoting Manley, 632 F.2d at 988).

Second, as in Martinez, the evidence viewed in the light most favorable to the Government established that Naim "explicitly told [Johnson] several times that he wanted to have" John Doe exploited; "that he sought out [Johnson] because" Johnson had the ability to contact and persuade John Doe;[13] and that—with respect to the third video of John Doe—Naim

_____

[13] After three days without correspondence, Naim emailed Johnson on February 14, 2013, to ask: "Can we do another [john]?" And on March 18, 2013, after another two days of no correspondence, Naim completely changed the subject of the prior email discussion to inquire: "hey think you can get [john] again?" (Tr. at 122-27; GX 215; GX 218.) The same pattern occurred in connection with Naim's March 30, 2013, email. (GX 220 ("Hey. think you can get [john] again?").) The natural inference is that Naim sought out Johnson on each of these instances because of Johnson's access to John Doe. Furthermore, the jury reasonably could have inferred that Naim initiated their entire April 21, 2013, chat with the intention of obtaining a video of John Doe (see Tr. at 132-35; GX 224-R), due to Naim's fixation on John Doe, based on evidence including but not necessarily limited to: (1) Naim's communications with John Doe's mother, including Naim's attempt to obtain a DVD of the Camp Simcha production of The Lion King; (2) Naim's communications with Jerry Biegeleisen concerning John Doe and the videos of John Doe, including Naim's apparent arousal at the idea of Biegeleisen watching the videos; and (3) Naim's repeated requests for a third, and then a fourth, video of John Doe. For the same reasons, the jury may have even inferred that Naim initiated the email conversation that began March 8, 2013, with the goal of asking the question that he eventually raised on March 18 (see GX 218), and the same with respect to the email conversation

44

and Johnson agreed to "how much it would cost, and how payment would be effected." 775 F.2d at 35. Naim did pay for that video, and received it. With this history, Naim then asked—four separate times—for a fourth video. The jury was entitled to find that those requests, considered in connection with the totality of circumstances, constituted a substantial step toward the further exploitation of John Doe. While Naim notes that the defendant in <u>Martinez</u> made a "down payment toward commission of a contemplated future act [which] sufficed, along with other factors, to be the last step required to accomplish the actual commission of the crime" (Def. Mem. at 6), the Government is correct that "a 'substantial step' need not be the 'last act necessary before the actual commission of the substantive crime.'" (Gov't Opp'n at 15 (quoting <u>Manley</u>, 632 F.2d at 987).) <u>See Farhane</u>, 634 F.3d at 146 (noting that the substantial step standard was a departure from the common law's requirement that conduct come "close to the completion of the intended crime" (citing <u>People v. Werblow</u>, 241 N.Y. 55, 69 (1925) (Cardozo, J.) ("dangerous proximity" test); <u>Commonwealth v. Peaslee</u>, 177 Mass. 267, 272 (1901) (Holmes, J.) ("very near to the accomplishment of the act" standard))). Moreover, in view of the Defendant's and Johnson's past conduct, the jury could have also inferred that any of Naim's requests for a fourth video, without more, were likely to have led directly to Johnson reaching out to John Doe and, if John Doe had been amenable, to the creation of a new exploitative video—the completion of the substantive offense.

### C.    New Trial Motion

In advocating for a new trial, Naim reiterates an argument raised in his motion for acquittal: that Naim had only the intent to purchase a video of John Doe, not the intent to create one. (<u>See</u> Def. Mem. at 7-8.)

However, the court has already found that the evidence at trial was sufficient to prove

---

that began on March 27, 2013, and concluded with the question that he eventually raised on March 30 (<u>see</u> GX 220).

that Naim had the intention to create—not merely purchase—a new video of John Doe. This is the case whether the evidence is viewed in the light most favorable to the Government (as with Naim's Rule 29 motion) or whether the court weighs the evidence for itself, taking into account all facts and circumstances (as it does here). See Ferguson, 246 F.3d at 134; Sanchez, 969 F.2d at 1413. The court has also already explained why Naim's communications with Johnson, the adult intermediary, constituted an attempt to commit sexual exploitation of John Doe. Accordingly, because "competent, satisfactory, and sufficient evidence in the record supports" the jury verdict, Sanchez, 969 F.2d at 1414, the court cannot find that letting that verdict stand would be a manifest injustice.

## IV.    CONCLUSION

For the reasons set forth above, Naim's motion for a judgment of acquittal or for a new trial is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
      May 19, 2015                United States District Judge