

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SK
F.#2013R01551

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 6, 2016

<u>By Hand and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

   Re: United States v. Roy Naim
     <u>Criminal Docket No. 13-660 (S-1) (NGG)</u>

Dear Judge Garaufis:

  The government respectfully submits this memorandum in opposition to the defendant's sentencing memoranda filed on August 26, 2015, and April 13, 2016.  ECF Nos. 119, 123.  The defendant is scheduled to be sentenced on May 18, 2016, at 11 a.m.  For the reasons set forth below, the government respectfully requests that the Court impose a severe sentence in this case, above the mandatory minimum, and commensurate with the defendant's egregious actions, mindful of the need for both specific and general deterrence, and in keeping with Congress's mandate to eliminate child abuse in all its forms.

Background

  On December 10, 2014, the defendant was convicted at trial on six counts: one count of attempted sexual exploitation of a child (18 U.S.C. § 2251(a)), four counts of receipt of child pornography (18 U.S.C. § 2252(a)(2)), and one count of possession of child pornography (18 U.S.C. § 2252(a)(4)(B)).

  The defendant is a former camp counselor who sought the production of sexually explicit videos of a child he previously counseled -- a boy he knew was undergoing medical treatment for a brain tumor ("John Doe").  The defendant used an online co-conspirator as an intermediary for the production of the videos and offered payment to incentivize their production.  The defendant also demanded to see the exploitation of other minor males and obtained at least 70 videos featuring the sexual exploitation of underage boys from the intermediary.

I.      The Defendant's Conduct

In May 2012, the defendant reached out to Jonathan Johnson, the administrator of the "BoysOnWebcam" website -- a website that contained images and videos of child pornography.  Tr. 183-84; GX-201; GX-202.  The defendant told Johnson in an email: "First off, I think it real cool what you are doing in general… And for free (except for the few secs ads that pop up which I hope you make lots of money."  GX-202 (May 28, 2012).  Over the course of the next fifteen months, the defendant continued to communicate with Johnson via email using two email addresses: naimroy@gmail.com and brooklynfun123@gmail.com. GX-200A (May 2012 to August 2013).

During their email communications, the defendant asked Johnson about the origin of the child pornography videos that Johnson made available on his website.  GX-202 (May 28, 2012) ("I am curious though, where you getting these videos from?").  Johnson made clear that the videos were original recordings that he created himself.  GX-202 (May 28, 2012) ("I don't 'get' them from anywhere. I record them myself on chatroulette, skype, omegle, etc.").  The defendant acknowledged and approved of Johnson's creation of child pornography.  GX-202 (May 28, 2012) ("It takes lots of time I am sure.  Really awesome of you!").  The defendant then pressed for details as to how the videos were created and learned that Johnson created the videos by pretending to be a fake girl online, video-conferencing with underage boys using the persona of the fake girl, and recording underage boys engaging in sexually explicit activity without their knowledge. GX-202 (May 28, 2012) (defendant: "Curious, so these boys, are you baiting them with a girl?"; Johnson: "I use a video of a fake girl and just pretend like I'm her . . . . so I can sit and record . . . without them even realizing it's not really her").  The defendant again acknowledged and approved.  GX-202 (May 29, 2012) ("That is really amazing! Ha. Man, and these teens just go for it not realizing she is doing the same thing over and over. LOL.").  Over the course of their conversation, the defendant and Johnson routinely referred to the fact that Johnson created child pornography videos for others, GX-205.1; GX-207, the defendant encouraged this conduct, GX-232 (Jan. 3, 2013) ("just keep posting as normal with new stuff"); GX-212 (Jan. 8, 2013) ("why not contact them? i can watch them all day"), and the defendant offered his support in the form of services, ideas, and payments, GX-202 (May 29, 2012) ("Just leave me to the marketing"); GX-215 (Jan. 20, 2013) ("An idea.  To increase more.  Show one of them and say you are getting this type"); GX-219 (Mar. 23, 2013) ("I click on ads for you and such"); GX-224r (Apr. 21, 2013) ("maybe I can pay one of your bill directly?").

The defendant obtained at least 70 videos featuring the sexual exploitation of underage boys from Johnson.  PSR ¶ 33.  The defendant admitted to investigators that he masturbated to the videos he obtained.  Tr. 598.

In January 2013, the defendant came across two child pornography videos featuring an underage boy who he knew personally -- John Doe. GX-213 (Jan. 19, 2013); GX-214 (Jan. 21, 2013); GX-516D; GX-526E; GX-402A.  The defendant knew John Doe because the defendant had previously served as John Doe's camp counselor at a camp for children with cancer.  Tr. at 204, 209, 216, 219, 222.  The defendant specifically recognized

2

John Doe as the individual in the video because of a scar left from cancer treatment. Tr. at 207-208; GX-402A ("Um. It's [john]. Trust me. Plus he is the only guy who has a mark near belly button from feeding tube."). The defendant downloaded the two videos and distributed them to another individual, and the defendant obtained additional gratification from doing so. GX-402A ("Tell me when you're ready. I wanna hear ya when you watching. . . . I just want to hear reaction . . . . Are you masturbating? . . . Hard eh.").

The defendant learned that Johnson had recorded one of the child pornography videos of John Doe just a few days earlier. GX-213 (Jan. 20, 2013). The defendant requested that Johnson take the two videos of John Doe down, noting that Johnson was "the source." GX-214 (Jan. 21, 2013). Johnson complied with the defendant's request. Tr. 193-94.

The defendant then requested that new child pornography videos of John Doe be made. In February 2013, after Johnson informed him that there were no more videos of John Doe, the defendant asked Johnson, "Think you can get another one?" GX-215 (Feb. 6, 2013). Johnson indicated that there was a possibility of creating a new video. GX-215 (Feb. 6, 2013) ("There's always a possibility."). The defendant then asked for a new video of John Doe to be made. GX-215 (Feb. 6, 2013) ("Ok. Then that's my request for incentive."); Tr. 596 (defendant confessed to agents "that he had asked Johnson to have a video made of [John]"). The ensuing conversation between the defendant and Johnson confirmed that the defendant was procuring from Johnson a new child pornography video that Johnson would create using the method that the two had previously discussed -- pretending to be a fake girl over videoconference. GX-215 (Feb. 6, 2013) (Johnson: "He's still speaking to me so there's definitely a chance lol"; defendant: "Where does he think you're from?"; Johnson: "'Anna' is from California :)"). The defendant repeated his request to Johnson several times for new videos of John Doe to be made. GX-215 (Feb. 6, 2013) ("If you can get one or two more ill go for it."; "Let me know if you can get one or two more with him."). The defendant promised to pay Johnson for creating the videos. GX-215 (Feb. 6-7, 2013) ("ill go for it"; "ill chime in"; "Ill even double"). The defendant then received a newly created video of John Doe from Johnson. GX-215 (Feb. 8, 2013) (defendant: "OMG. Happened tonight? How long?"; Johnson: "15 minutes" and describing content of [john].avi); GX-605A; GX-605B; GX-503. Johnson informed the defendant that he (Johnson) had recorded the video for the defendant. GX-215 (Feb. 8, 2013) (Johnson: "I basically did him just for you"). The defendant paid Johnson for the "the recorded" video, as promised, and then downloaded it. GX-215 (Feb. 10, 2013) ("Gonna go with the recorded one plus video 1 & 2. Will do $30"); GX-701; GX-703; GX-704; GX-705.

A few days later, the defendant asked for another new video of John Doe to be made. GX-215 (Feb. 14, 2013) ("Can we do another [john]?"). In March 2013, the defendant asked again for another new video of John Doe to be made. GX-218 (Mar. 18, 2013) ("hey think you can get [john] again"); GX-220 (Mar. 30, 2013) ("Hey. think you can get [john] again?").

3

Throughout April 2013, the defendant continued to write to Johnson and seek additional videos from BoysOnWebcam. The defendant and Johnson discussed videos and pricing, and the defendant again told Johnson he would be interested in more videos of John Doe. After Johnson sent the defendant a video of another individual, the defendant commented, "i think [John] was best quality wise." PSR ¶ 25.

The investigation revealed that the defendant's targeting and solicitation of minor males was not limited to his interactions with Johnson. The defendant's admissions in his diary and online interactions over Facebook and Craigslist revealed other occasions in which the defendant sought sexually explicit images of minor males. PSR ¶¶ 35-38.

II.     The Defendant's Victims

The defendant had a particular obsession with John Doe, directing and paying for his online exploitation. A victim impact statement from John Doe's mother has been submitted to the Court. See Exhibit A. Through her statement, John Doe's mother explains the pain, embarrassment, and anger that her son experienced, not only from learning that he had been deceived and exploited online by an adult male, and learning that the exploitation was shared over the internet for the gratification and amusement of others, but also from learning that a counselor he knew and trusted was behind the exploitation. John Doe's mother explains that the experience caused her son to lose trust in adults, be fearful of others, and abandon all hope of having a normal life. Furthermore, John Doe's mother explains the pain that she herself experienced from learning that her son, who had already lost much of his childhood to grappling with brain cancer, had then also been a victim of a sex crime, and the betrayal attendant to discovering that the same person that she had entrusted with her son's care at a camp for vulnerable children was the person responsible for hurting him. This victim impact statement underscores the tremendous harm caused by the defendant's conduct.

The defendant also encouraged the ongoing exploitation of multiple other minor males, downloading approximately 70 videos onto his computer. Three of the individuals -- the ones victimized in the videos charged in Count Four -- have been identified. However, they have asked not to be contacted in connection with the images of their abuse.

III.    The Guidelines Calculation

The defendant's Guidelines range is an effective life sentence (120 years). This range is a product of several steps. Initially, the government agrees with the Probation Department that the defendant has a total offense level of 43 and a criminal history category of I, which results in a Guidelines range of life imprisonment. PSR ¶ 108. However, because the statutes of conviction here do not provide for life imprisonment, the range defaults to the cumulative statutory maximum -- 30 years for Count Three, 20 years for each of Counts Four through Seven, and 10 years for Count Eight, for a total of 120 years. See PSR ¶ 107; U.S.S.G. §§ 5G1.1(a), 5G1.2(d); United States v. Dorvee, 616 F.3d 174, 180-81

4

(2d Cir. 2010) (where the Guidelines range exceeds the statutory maximum sentence, "the statutory maximum sentence operate[s] as the Guidelines sentence"); see, e.g., United States v. Boroczk, 705 F.3d 616, 622 (7th Cir. 2013) (where the defendant's Guidelines range was life but the statutes of conviction did not provide for life, the Guidelines range defaulted to the cumulative statutory maximum) (citing authorities and calculating range of 130 years); United States v. Lewis, 594 F.3d 1270, 1275-76 (10th Cir. 2010) (same) (citing authorities and calculating range of 330 years); United States v. Sarras, 575 F.3d 1191, 1209 (11th Cir. 2009) (same) (citing authorities and calculating range of 100 years).[1]

   The two-point enhancement for distribution pursuant to U.S.S.G. § 2G2.1(b)(3) is appropriate. "Distribution" includes "any act . . . related to the transfer of material involving the sexual exploitation of a minor," including "production," "transmission," and "possession with intent to distribute." U.S.S.G. § 2G2.1 app. note 1. Here, the enhancement is warranted because the defendant directed Johnson to produce sexually explicit videos for him and it was foreseeable that Johnson would create and possess those videos with the intent to distribute them to the defendant and others, just as Johnson had done previously. See United States v. Brown, 613 F. App'x 58 (2d Cir. 2015) (summary order) (§ 2G2.1(b)(3) enhancement appropriate where the defendant directed a co-conspirator "to take and retain images and videos for him" and "it was foreseeable" to the defendant that the co-conspirator "would possess those images and videos with the intent to distribute them to him").

   The five-point enhancement for distribution in exchange for a thing of value pursuant to U.S.S.G. § 2G2.2(b)(3)(B) is appropriate. Here, the enhancement is warranted because the defendant directed Johnson to transmit (i.e. "distribute") sexually explicit videos to him in exchange for a gift card to the electronics store Newegg (i.e. "a thing of value").

   The five-point enhancement for pattern of activity pursuant to U.S.S.G. § 2G2.2(b)(5) is appropriate. A "pattern of activity" means "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." U.S.S.G. § 2G2.2(b)(5) app. note 1. Here, the enhancement is warranted because the defendant successfully solicited the sexual exploitation of John Doe (the making of a video) and then subsequently attempted to do so again (repeated attempts to have more videos made). PSR ¶¶ 19-25. That alone constitutes two separate instances of sexual exploitation and satisfies the enhancement. Moreover, the defendant's admissions in his diary show and online interactions over Facebook and Craigslist show other instances of sexual exploitation. See PSR ¶¶ 35(d), 37(a)-(e), 38(a), (c), (e)-(f) (production and attempted production of sexually

---

[1] The Guidelines instruct that, given the crimes of conviction, the Court may not downwardly depart on the basis of diminished capacity, see U.S.S.G. § 5K2.13, and family ties and responsibilities and community ties are not relevant to a downward departure, see U.S.S.G. § 5H1.6.

5

explicit images of minors who were ages 14 to 17).[2] The repeated nature of the conduct demonstrates the defendant's intentionality and willfulness, and that his actions were not a fluke or aberration. (Notably, the Guidelines instruct that, given the crimes of conviction, the Court may not downwardly depart on the basis of "aberrant" behavior -- even if the defendant were to meet the criteria for that departure, which he does not. See U.S.S.G. § 5K2.20.)

Finally, the denial of a three-point reduction for acceptance of responsibility is also appropriate. The defendant's pretrial statements and conduct included repeated deflection of blame and false statements to the Court and medical professionals. In addition, although the defendant claims that he did not deny the essential factual elements of guilt at trial, ECF No. 119 at 6, the defendant did put the government to its burden at trial on both factual and legal elements, refusing to stipulate to the admission of any records, seeking to disqualify the government's forensic expert in front of the jury, and cross-examining the government's witnesses on factual issues. This is not the rare case in which a trial defendant nevertheless merits credit for acceptance. Cf. Rengifo v. United States, No. 14-CV-3997, 2015 WL 5711137, at *9 (S.D.N.Y. Sept. 28, 2015) (discussing the possibility that a defendant may be entitled to a two-point reduction for acceptance of responsibility where he has agreed to a trial on stipulated facts).

The government recognizes that since United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory rather than mandatory. However, when imposing a sentence, a district court is still required to consider the Guidelines. See 18 U.S.C. § 3553(a)(4); United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005) (post-Booker) ("sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them"). A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49-50 (2007) (citation omitted).

The defendant argues that the Guidelines "may not be worthy of respectful consideration" by the Court and cites Dorvee in support of this proposition. ECF No. 119 at 9. However, Dorvee has no application in cases involving the sexual exploitation of a child. In Dorvee, the Second Circuit was concerned with the Guidelines applicable to what it termed a "run-of-the-mill case," where the defendant was convicted solely of distribution of child pornography under § 2252(a)(2) and there was no evidence that the defendant had exploited a child. 616 F.3d at 176, 186. Here, the defendant has been convicted of attempted sexual exploitation of a child because the defendant specifically pursued the exploitation of John Doe, a boy with cancer whom he knew and counseled. This is not a "run-of-the-mill case." The Second Circuit has repeatedly clarified that Dorvee does not apply in such circumstances. See United States v. Oehne, 698 F.3d 119, 125-26 (2d Cir. 2012) (defendant

---

[2] The defendant's Facebook conversations indicate that J.N. was 17 years old, H.H. was 14 years old, and S.B. and J.M. were 16 years old.

6

convicted under § 2251(a) and § 2252A(a)(2); "not a run-of-the-mill case" as in <u>Dorvee</u>; 540-month sentence affirmed); <u>United States v. Rafferty</u>, 529 F. App'x 10, 13 (2d Cir. 2013) (defendant convicted under § 2251(a) and § 2252A(a)(5)(B); <u>Dorvee</u> distinguished; 720-month sentence affirmed); <u>United States v. Bowman</u>, 523 F. App'x 767, 769 (2d Cir. 2013) (defendant convicted under § 2252(a)(2) but "actually assaulted his daughter"; reliance on <u>Dorvee</u> misplaced; 276-month sentence affirmed).

The Guidelines here and their associated enhancements provide useful guidance.  <u>See</u> United States Sentencing Commission, The History of the Child Pornography Guidelines at 7 (2009) ("in amending the child pornography guidelines over the years, the Commission has reviewed sentencing data, considered public comment on proposed amendments, conducted public hearings on proposed amendments, studied relevant literature, and considered pertinent legislative history"); United States Sentencing Commission, Report to the Congress: Federal Child Pornography Offenses at 247 n.2 (2012) (the "Commission's 2010 survey of federal district judges revealed that the vast majority of judges surveyed stated that the guideline and statutory penalty ranges in production cases were appropriate as a general matter"); <u>see</u> also <u>United States v. Cox</u>, 458 F. App'x 79, 83 (2d Cir. 2012) (limiting <u>Dorvee</u> and explaining that district court may still consider Guidelines affected by Congressional adjustment); <u>United States v. Rafferty</u>, 529 F. App'x 10, 13 (2d Cir. 2013).  The Court should consider them carefully and impose a severe sentence.  <u>See</u> <u>United States v. Hasse</u>, 526 F. App'x 8, 11(2d Cir. 2013) (in a child pornography case, <u>Dorvee</u> does not support the contention that any sentence above the statutory minimum is substantively unreasonable); <u>United States v. Broxmeyer</u>, 699 F.3d 265, 291 (2d Cir. 2012) (when, in <u>Dorvee</u>, the Second Circuit vacated a statutory <u>maximum</u> sentence, it "nowhere suggested that it would be an abuse of discretion for the district court to accord some weight to the referenced Guidelines in imposing a sentence above the statutory <u>minimum</u>").

<u>Argument</u>

In his sentencing memoranda, the defendant requests that the Court sentence the defendant to fifteen years in prison -- notwithstanding that the defendant's sentencing Guidelines call for what is effectively a life sentence (120 years) -- based on the factors set out in 18 U.S.C. § 3553(a).  At the same time, the defendant argues that imposing the mandatory minimum sentence of fifteen years in prison would be unconstitutional in this case.  For the reasons set forth below, these arguments should be rejected.

I. The Factors Set Forth in 18 U.S.C. § 3553 Support the
 <u>Imposition of a Severe Sentence                         </u>

The defendant committed an extremely serious offense.  He was personally responsible for soliciting the exploitation of a minor (John Doe) who would not otherwise have been further exploited.  The defendant's conduct was particularly egregious because he chose to victimize a child whom he knew to be particularly vulnerable and whom he had previously been entrusted to protect.  The defendant's conduct was part of a broader pattern

7

of predatory activity, in which he sought the exploitation of multiple minors over multiple platforms over years. The need for specific and general deterrence also supports the imposition of a severe sentence.

      A.      <u>The Seriousness of the Offenses and the Need for General Deterrence</u>

By personally directing Johnson to exploit John Doe and offering to pay for that exploitation, the defendant essentially acted as the abuser himself. The third video of John Doe was created because of the defendant, at his behest, and further distributed by him. The defendant's continued pushing of Johnson to create more videos made the defendant the primary proponent of John Doe's exploitation.

The defendant's conduct is made more serious by the fact that the defendant specifically targeted a vulnerable victim -- John Doe, a boy he personally knew to be suffering from a brain tumor. The defendant's conduct is made <u>even</u> more serious by the fact that the defendant held a position of trust as John Doe's previous camp counselor, and in that role was charged with protecting and supporting him as he grappled with his disease. The defendant's exploitation of John Doe not only breached any sense of common decency but also breached his special duty to serve as a lifelong friend and counselor to John Doe.

The defendant argues that, "While the actions occurred over a period of several months, these incidents largely involved the viewing of pornographic images, and nothing more." ECF No. 123 at 7. This is a stunning minimization of the defendant's conduct. The defendant urged the exploitation of John Doe and multiple other children and offered services, idea, and payment in support of that exploitation. The defendant was responsible for the creation of the third video of John Doe -- it would not exist but for the defendant and his offer of payment. And the defendant's conduct was not limited to John Doe. For example, he urged the creation of additional videos of the boys featured in the videos charged in Count Four, asking Johnson, "why not contact them? i can watch them all day." GX-212 (Jan. 8, 2013).

The defendant argues that his actions are less serious because he "engaged in no direct communication with minors." ECF No. 123 at 9. That is outrageous. When it came to the exploitation of John Doe, the defendant and Johnson were partners in crime. The defendant is no less culpable for John Doe's exploitation simply because he interposed a middleman to carry out that exploitation.

The need for general deterrence also counsels in favor of a severe sentence. A lengthy sentence in this case would send a strong message that individuals entrusted with the care of children must abide their special responsibility to protect those children, that perpetrators cannot obtain leniency by merely deflecting blame onto their co-conspirator, and that predators cannot seek refuge in private online conversations by regarding them as "fantasy" or by interposing a middleman between themselves and their victims to avoid real criminal consequences.

B. <u>The Need to Protect the Public and for Specific Deterrence</u>

The defendant's claims that his conduct in this case was "aberrational" and "not representative whatsoever of the person that he truly is" are entirely without merit. ECF No. 123 at 10. The defendant's conduct reveals that he led a private life wholly distinct from his public image and the image he showed family and friends. The defendant's conduct in connection with "BoysOnWebcam" demonstrates that his private life included a persistent sexual interest in minor males. The defendant actively sought out sexually explicit videos of John Doe and other minor males, he admitted to masturbating to the videos he obtained, he sent two of the videos onward to another individual for mutual gratification, he discussed obtaining sexual gratification from the videos in his conversations with that individual, and he urged the creation of more videos in furtherance of that sexual interest. <u>See</u> Exhibit C (sampling of the videos the defendant obtained from BoysOnWebcam).

The defendant's conduct over other online platforms, including Facebook and Craigslist, and his admissions in his diary, further establish a history and pattern of targeting minor males for purposes of sexual gratification. That pattern repeatedly involved victimizing males between the ages of 14 and 17 and manipulating them into creating and distributing sexually explicit images. <u>See</u> PSR ¶¶ 35(d), 37(a)-(e), 38(a), (c), (e)-(f).

Neuropsychology professor Dr. Robert Denney reviewed over 14,000 pages of online communications between the defendant and individuals who identified themselves as teenagers during the course of conducting an evaluation of the defendant. Dr. Denney observed that the defendant "repeatedly moved the conversations toward sexual issues in a gradual manner," the conversations "nearly always moved into discussions of masturbation," and the defendant "repeatedly brought up the issue of sending pictures or videos of a sexual nature." Dr. Denney also observed that the defendant "appeared to be controlling the conversations to bring them back to sexual content," would "indicate trust was important and trust could be demonstrated by answering sensitive sexual questions" and sending sexually explicit images, and "repeatedly encouraged the individuals and built up trust between them in a manner which appeared manipulative." Denney Rep. at 10.

On at least one of these occasions, the defendant again targeted a vulnerable victim -- another child with cancer. PSR ¶ 38(a). The defendant also attempted to accomplish for himself what he was able to accomplish through Johnson -- obtain sexually explicit video from minors via online live video-chat. PSR ¶ 38(c) (defendant challenged H.H., age 14, to "do it on webcam") ; PSR ¶ 38(e) (defendant suggested that S.B., age 16, show himself via Skype). The need for specific deterrence counsels in favor of a severe sentence.

C. <u>The History and Characteristics of the Defendant</u>

The defendant suggests that the absence of any documented criminal history is a reason to impose a sentence below the Guidelines range and at the statutory minimum. ECF No. 123 at 10. While the Court may consider the defendant's status as a first-time

offender in fashioning a sentence that complies with § 3553(a), the Guidelines and the statutes of conviction already account for this trait in setting forth the appropriate ranges for punishment.  See PSR ¶ 73 (placing defendant in Criminal History Category I); § 2251(e) (punishment provision for Count Three) (providing for imprisonment for 15 to 30 years for first-time offenders, 25 to 50 years for second-time offenders, and 35 year to life for third-time offenders); § 2252(b)(1) (punishment provision for Counts Four through Seven) (providing for imprisonment for 5 to 20 years for first-time offenders, and 15 to 40 years for second time offenders).  Notably, the absence of a documented criminal history does not distinguish the defendant from the vast majority of defendants convicted of sexual exploitation offenses.  See United States Sentencing Commission, Report to the Congress: Federal Child Pornography Offenses at 259 (2012) (in fiscal year 2010, 77 percent of sexual exploitation offenders were in Criminal History Category I).

The defendant also reports a personal history that includes a hearing disability, undocumented immigration status, and childhood abuse.  The Court may consider these personal struggles in assessing the defendant's personal history and fashioning a sentence that complies with § 3553(a).[3]  The government notes that these difficulties do not explain or excuse the conduct at issue in this case.  In addition, approximately 29 percent of sexual exploitation offenders report histories of sexual abuse during their own childhoods.  See United States Sentencing Commission, Report to the Congress: Federal Child Pornography Offenses at 259 (2012); see also United States v. Kim, 313 F. Supp. 2d 295, 301 (S.D.N.Y. 2004) (declining to depart downwardly on the basis of childhood abuse because such abuse "is not atypical of persons who end up committing crimes"); United States v. Holtz, 285 F. App'x 548, 552 (10th Cir. 2008) (district court observed that, in child pornography cases, the fact that the defendant suffered prior sexual abuse was not uncommon).

The government here does not advocate for a Guidelines sentence, effectively life in prison, but rather requests that the Court -- having given the Guidelines the serious consideration they are due -- sentence the defendant to a severe sentence, above the statutory minimum, that appropriately reflects the egregiousness of the defendant's conduct and provides the appropriate specific and general deterrence.

---

[3] However, to the extent that the defendant attempts to obtain the minimum sentence permitted by law because his eventual deportation after incarceration is, in itself, "a severe punishment," that argument is without merit.  ECF No. 123 at 6.  The Second Circuit has expressly rejected using deportation as a justification for shortening a defendant's sentence.  See United States v. Restrepo, 999 F.2d 640, 647 (2d Cir. 1993) ("we cannot see that these effects [of deportation] justify shortening the sentence prescribed by the Guidelines"); United States v. Ejike, No. 06-CV-13327, 2007 WL 1946549, at *4 (S.D.N.Y. June 27, 2007) ("the Second Circuit has held that deportability is not a reasonable basis for a downward departure from the Guidelines").

10

D. <u>The Lack of Remorse and Deflection of Responsibility</u>

The defendant baldly claims that he "has accepted responsibility from the beginning" and "lied to no one." ECF No. 119 at 8. To the contrary, the defendant's pretrial statements and conduct included repeated deflections and false statements to the Court and medical professionals.

In support of his pretrial motion to suppress his confession, the defendant falsely accused law enforcement agents of using coercive tactics during their execution of a search warrant on the defendant's home. For example, the defendant falsely stated that law enforcement agents referenced his immigration status during the execution of the search warrant on his residence. As the Court observed, in declining to credit the defendant's testimony in this regard, "[n]ot only was Defendant's testimony rebutted by the Government and uncorroborated by any other defense witness, but Defendant's demeanor and equivocal response are also inconsistent with credible testimony" and was "in some conflict with his own concession." ECF No. 71 at 4 n.3. In another example, the defendant falsely testified that law enforcement agents threated to "rip the walls down" if he did not cooperate; that testimony was likewise, in the view of the Court, "neither corroborated nor convincing." ECF No. 71 at 13-14.

In support of his request for leniency, the defendant also underwent a pretrial mental health examination, which he submits in connection with sentencing. That evaluation further evidences the defendant's minimization and propagation of falsehoods. The defendant claimed to Dr. Kirwin that he was on a "mission to protect teenage boys from sexual predation on the internet," that he "truly believed that his acquisition of the videos was a way of 'protecting' [John Doe]," and that his interactions on the internet were "Not sexual but social." Kirwin Rep. at 9-11. The defendant simply failed to acknowledge the true predatory nature of his actions, the actual sexual motivations behind them, and the irreparable harm he has caused.

The Court may consider the defendant's lack of remorse and failure to acknowledge responsibility as a basis for withholding leniency. <u>See, e.g.</u>, <u>Robinson v. Heath</u>, No. 12-CV-2116, 2013 WL 5774544, at *11 (E.D.N.Y. Oct. 24, 2013) (Garaufis, J.) ("lack of remorse and failure to acknowledge responsibility consistently have been recognized as constitutionally-permissible factors that courts may take into account in determining an appropriate sentence") (citing cases).

II. <u>The Eighth Amendment Does Not Bar the Imposition of a Severe Sentence</u>

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "contains a narrow proportionality principle that applies to noncapital cases." <u>Ewing v. California</u>, 538 U.S. 11, 20 (2003) (plurality opinion) (internal marks omitted). This principle, however, "does not require strict proportionality between crime and sentence. Rather it forbids only extreme

sentences that are grossly disproportionate to the crime." Ewing, 538 U.S. at 23 (internal marks omitted).

The defendant argues that, in the particular circumstances of this case, a sentence within the statutory range would constitute cruel and unusual punishment because it would be grossly disproportionate to the defendant's crimes. ECF No. 119 at 14.

The Supreme Court and the Second Circuit have warned that "successful challenges to the proportionality of particular sentences should be exceedingly rare." Ewing, 538 U.S. at 22 (internal marks omitted); accord Hutto v. Davis, 454 U.S. 370, 374 (1982); United States v. Steele, 390 F. App'x 6, 17 (2d Cir. 2010); see also United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991) (the "Eighth Amendment condemns only punishment that shocks the collective consciousness of society"; life without parole for murderer did not meet this standard). "Lengthy prison sentences, even those that exceed any conceivable life expectancy of a convicted defendant, do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on a proper application of the Sentencing Guidelines or statutorily mandated consecutive terms." United States v. Yousef, 327 F.3d 56, 163 (2d Cir. 2003); accord United States v. Ramos, 685 F.3d 120, 134 n.11 (2d Cir. 2012); Caparotta, 890 F. Supp. 2d at 211 n.12.

In determining whether gross disproportionality is present, the Court must first examine whether the legislature "has a reasonable basis for believing that [a sentence advances] the goals of [its] criminal justice system in any substantial way" and, if so, accord substantial deference to the legislature's judgment about the appropriate punishment. Ewing, 538 U.S. at 22 (internal marks omitted); see Solem v. Helm, 463 U.S. 277, 292 (1983). The Court must then compare the gravity of the offense with the severity of the sentence. Id. at 28. If the sentence "reflects a rational legislative judgment, entitled to deference," the Court need not go further. Id. at 29.

### A.   Congress's Judgment Regarding the Appropriate Punishment Merits Deference

Congress is entitled to substantial deference here because there is a reasonable basis for believing that a sentence within the statutory range advances the goals of the criminal justice system and the interests of the government. In the course of enacting and amending the laws governing child exploitation, Congress has made several important findings:

- "The Government has a compelling state interest in protecting children from those who sexually exploit them, including both child molesters and child pornographers. The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance, and this interest extends to stamping out the vice of child pornography at all levels in the distribution chain." PROTECT Act, Pub. L. No. 108-21, § 501(2) (2003) (internal marks and citations omitted).

12

- "[C]hild pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children."  Child Pornography Act of 1996, Pub. L. No. 104-208, § 121(4) (1996).

- "[T]he existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and it inflames the desires of child molesters, pedophile, and child pornographers who prey on children."  Child Pornography Act of 1996, Pub. L. No. 104-208, § 121(10) (1996).

- "Child pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed."  Pornography Prosecution Act of 2007, Pub. L. No. 110-358, § 102(3) (2008).

- "[T]he elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct."  Child Pornography Act of 1996, Pub. L. No. 104-208, § 121(13) (1996).

- "The Government thus has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective.  The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."  PROTECT Act, Pub. L. No. 108-21, § 501(3) (2003) (internal marks and citations omitted).

Congress's findings warrant deference.  See, e.g., Turner Broadcasting Systems, Inc. v. FCC, 520 U.S. 180, 196 (1997)

### B. Sentencing this Defendant Within the Statutory Range Would Not Be Grossly Disproportionate to the Crimes He Committed

Congress and the courts have recognized child exploitation crimes as extremely grave offenses.  See supra; United States v. Williams, 553 U.S. 285 (2008) ("Child pornography harms and debases the most defenseless of our citizens.").  These crimes, "at their core demand the sexual exploitation and abuse of children.  Not only are children seriously harmed -- physically, emotionally, and mentally -- in the process of producing such pornography, but that harm is then exacerbated by the circulation, often for years after the fact, of a graphic record of the child's exploitation and abuse."  Reingold, 731 F.3d at 216.

13

For the reasons set forth above, the defendant's conduct in this case falls well within the range of deplorable conduct contemplated by these statutes. The defendant's conduct exposed a vulnerable child whom he knew to great harm and demanded the continued harm of other children.

With these interests in mind, Congress provided for a statutory range of punishment of 15 to 30 years imprisonment for first-time offenders guilty of attempted sexual exploitation of a child, 5 to 20 years imprisonment for first-time offenders guilty of receipt of child pornography, and 0 to 10 years imprisonment for first time offenders guilty of possession of child pornography. 18 U.S.C. §§ 2251(a), (e), 2252(a)(2), (b)(1), (a)(4)(B), (b)(2). Hence, the statutory range for this defendant is 15 to 120 years.

The fact that the lower end of the statutory range is mandatory does not undermine an otherwise acceptable punishment. See Reingold, 731 F.3d at 219 ("[n]o different conclusion is warranted because Congress mandated a minimum"). In fact, statutorily mandated sentences merit great deference because they "represent not the judgment of a single judge but the collective wisdom of the Legislature and, as a consequence, the citizenry." Reingold, 731 F.3d at 220 (internal marks and ellipses omitted).

The fact that the higher end of the statutory range is beyond the defendant's life expectancy is also of no moment. The Second Circuit and other courts "have universally upheld sentences where the term of years is greater than the defendant's expected natural life" for a variety of crimes. Yousef, 327 F.3d at 163 (citing cases). Indeed, "it is rare that a sentence falling within a legislatively prescribed term of years will be deemed grossly disproportionate." Reingold, 731 F.3d at 212.

Imposing a sentence within the statutory range in this case does not give rise to an inference of gross disproportionality. The Supreme Court has identified a term-of-years sentence as being grossly disproportionate only once in the past 35 years -- where a defendant with six prior non-violent felonies was sentenced to a non-mandatory term of life without parole for passing a bad check in the amount of $100. See Solem v. Helm, 463 U.S. 277 (1983). The Supreme Court noted that the crime of conviction was "one of the most passive felonies a person could commit" involving "neither violence nor threat of violence to any person," while the punishment was "the most severe" non-capital sentence "that the State could have imposed on any criminal for any crime." Id. at 296-97. The facts and circumstances here are simply not comparable to those presented in Solem. The defendant's crimes were not the "most passive felonies," Solem, 463 U.S. at 296, nor were they "nonviolent and victimless" crimes, Harmelin, 501 U.S. at 1002 -- they were affirmative acts of child exploitation designed to cause lasting harm on multiple children.

Since Solem, the Supreme Court has rejected every as-applied Eighth Amendment challenge on the basis that it does not even raise a threshold inference of gross disproportionality. See Ewing v. California, 538 U.S. 11, 21 (2003) (rejecting Eighth Amendment challenge to 25-year sentence for theft of golf clubs worth $1,200); Harmelin, 501 U.S. 957 (rejecting Eighth Amendment challenge to life without parole for first-time

14

offender convicted of possessing 672 grams of cocaine); Hutto v. Davis, 454 U.S. 370 (1982) (rejecting Eighth Amendment challenge to 40-year sentence for marijuana possession); Rummel v. Estelle, 445 U.S. 263 (1980) (rejecting Eighth Amendment challenge to life without parole for third nonviolent felony of obtaining money by false pretenses).

Indeed, the Second Circuit and others "have regularly rejected Eighth Amendment challenges to child pornography statutes." United States v. Puglisi, 458 F. App'x 31, 35 (2d Cir. 2012) (citing cases from the Third, Sixth, Seventh, Eighth, and Eleventh Circuits); United States v. Caparotta, 890 F. Supp. 2d 200, 211 n.12 (E.D.N.Y. 2012) (Matsumoto, J.); see, e.g., United States v. Brandt, No. 12-CR-16321, 2014 WL 4723741, at *3 (11th Cir. Sept. 24, 2014) (as-applied challenge) (sentence of 1,080 months imprisonment for defendant convicted of three counts of § 2251(a) did not violate the Eighth Amendment; defendant used the internet to entice three minor females ages six to thirteen to photographs themselves and send him the photographs; defendant had no criminal history and no physical contact with the victims).

Accordingly, there is no basis for an inference of gross disproportionality here.

### C. The Court Need Not Conduct Further Analysis

Because a threshold analysis of the crime committed and the sentence imposed does not lead to an inference of gross disproportionality, the Court need not engage in an analysis of comparative sentencing within and between jurisdictions. See Solem, 463 U.S. at 290-92; Harmelin, 501 U.S. at 1004-05; Ewing, 538 U.S. at 23; Reingold, 731 F.3d at 222; McEwan, 445 F.3d at 250.

### Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a severe sentence, above the statutory minimum, in this case.

    Respectfully submitted,

    ROBERT L. CAPERS
    United States Attorney

By:    /s/
    Saritha Komatireddy
    Assistant U.S. Attorney
    (718) 254-6054

cc:    All counsel of record (via ECF)